E-FILED
Monday, 04 October, 2004  05:37:38 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| CHS INC., formerly known as CENEX HARVEST STATES COOPERATIVES, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Cause No.: 03-3263 ) |
| CHRISTOPHER BICKHAUS, | ) ) ) |
| Defendant. | ) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff CHS Inc., formerly known as Cenex Harvest States Cooperatives ("CHS"), by its undersigned attorneys, and, pursuant to Federal Rule of Civil Procedure 56, moves this Court for an Order granting its Motion for Summary Judgment on its claims as set forth in CHS' First Amended Complaint, because there is no genuine issue of material fact and Plaintiff is entitled to judgment as a matter of law. In support of this Motion, CHS states as follows:

**INTRODUCTION**

At all relevant times herein, Fastop Inc.[1] ("Fastop") was engaged in, among other things, the retail marketing of gasoline and diesel fuel to the public via retail sites, generally referred to as convenience stores, in the states of Illinois and Missouri. Defendant Bickhaus owns, or owned at all relevant times herein, all of the capital stock of Fastop.

---

[1] Fastop Inc. has represented to CHS that it also does business as "Fastop Convenience Stores Inc.," and "Fastop Convenience Stores Inc. of Quincy ILL." Fastop Inc., Fastop Convenience Stores Inc., Fastop Convenience Stores, Inc. of Quincy ILL, are collectively referred to herein as "Fastop."

In May 2002, CHS and Fastop entered into a business relationship, wherein CHS agreed to sell to Fastop, and Fastop agreed to purchase from CHS, energy products, including, but not limited to, gasoline and diesel fuel. Fastop agreed to resell these energy products at certain of Fastop's convenience stores. During the course of their business relationship, Fastop became indebted to CHS pursuant to the terms of two promissory notes executed by Fastop and pursuant to the terms of a Participation Agreement executed by Fastop.

The core issue in this case is whether Defendant Bickhaus is personally liable to CHS for such indebtedness of Fastop pursuant to the clear and unambiguous terms of a Guaranty of Credit (the "Guaranty") signed by Bickhaus. Whether Bickhaus is personally liable for Fastop's indebtedness to CHS is a question of law for the Court to decide. As shown below, Bickhaus is personally liable for such indebtedness pursuant to relevant case law. Therefore, summary judgment should be entered in favor of CHS as to Bickhaus' liability for Fastop's indebtedness pursuant to the terms of the Guaranty.

In the event this Court finds Bickhaus liable to CHS for Fastop's indebtedness pursuant to the terms of the Guaranty, then CHS seeks summary judgment as to the amount of damages owed to CHS by Bickhaus. There is no genuine issue of material fact as to the amount of indebtedness owed to CHS by Fastop pursuant to the terms of the two promissory notes and the Participation Agreement executed by Fastop. Therefore, this Court should also grant summary judgment to CHS as to the amount of damages sought in CHS' First Amended Complaint.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     On or about May 21, 2002, CHS and Fastop entered into a sales and purchase relationship. Pursuant to this relationship, CHS agreed to sell to Fastop, and Fastop agreed to purchase from CHS, energy products, including, but not limited, to gasoline and diesel fuel.

Fastop agreed to resell these energy products at certain of Fastop's convenience stores in Illinois and Missouri identified by the CENEX brand (the "Cenex-Identified Sites"). (Declaration of Rick Cummings ("Cummings Declar."), attached as **Exhibit 1** at ¶ 5; Branded Refined Fuels and Lubricants Master Marketing Agreement attached as Exh. A).

2.  On or about June 14, 2002, Fastop executed a Promissory Note (the "June 14, 2002 Note"), for value received. Fastop promised to pay to the order of CHS the principal sum of Seventy Thousand & Five Hundred Dollars ($70,500.00), together with interest on the unpaid principal amount at the rate of six percent (6.00%) per annum. The underlying indebtedness evidenced by the June 14, 2002 Note arose from funds advanced to Fastop by CHS in connection with Fastop's agreement that the petroleum image elements of the seventeen convenience stores referred to in the First Amended Complaint as the Cenex-Identified Sites would be branded CENEX. (First Amd. Compl. ¶ 8; Answer First Amd. Compl. ¶ 8; Exh. 1, Cummings Declar. at ¶ 6; June 14, 2002 Note attached as Exh. B).

3.  Fastop was to pay the principal and interest accruing on the unpaid principal amount of the June 14, 2002 Note commencing on July 15, 2002, at the rate of three quarters of a cent ($.0075) per gallon added to all purchases of refined fuel products by Fastop from CHS. The entire remaining balance on the June 14, 2002 Note, including accrued interest, was due and payable in full on or before July 15, 2003. (First Amd. Compl. ¶ 9; Answer First Amd. Compl. ¶ 9; Exh. 1, Cummings Declar. at Exh. B).

4.  After all just credits were given pursuant to the terms of the June 14, 2002 Note, the entire remaining balance due on July 15, 2003 was $31,120.89. Notwithstanding the terms of the June 14, 2002 Note, Fastop failed to pay any part of the remaining balance of $31,120.89 due

on July 15, 2003, pursuant to the June 14, 2002 Note and is, therefore, in default as of July 15, 2003.  (Exh. 1, Cummings Declar. at ¶ 7).

5. On or about January 21, 2004, CHS filed a Chapter 11 Proof of Claim with the United States Bankruptcy Court for the Central District of Illinois in Fastop's Chapter 11 bankruptcy, Case No. 03-74100 (the "Bankruptcy Case"), stating the principal amount owed under the June 14, 2002 Note is $31,120.89.  (Exh. 1, Cummings Declar. at ¶ 8; Bankruptcy Proof of Claim Form attached as Exh. C).

6. On or about March 26, 2003, Fastop executed an Installment Promissory Note (the "March 26, 2003 Note"), for value received, promising to pay to the order of CHS the principal sum of $1,360,697.83, together with interest from March 26, 2003, accruing at the rate of 12.0% per year on the unpaid principal amount until paid in full.  The underlying indebtedness evidenced by the March 26, 2003 Note arose from the sales of refined fuel products by CHS to Fastop for which Fastop failed to pay when due.  The March 26, 2003 Note included a payment schedule that set forth the amounts and due dates of periodic payments to be paid by Fastop to CHS.  The final payment on the March 26, 2003 Note was due on June 27, 2003.  (First Amd. Compl. ¶ 25; Answer First Amd. Compl. ¶ 25; Exh. 1, Cummings Declar. at ¶ 9 and Exh. D).

7. After all just credits were given pursuant to the terms of the March 26, 2003 Note, the entire remaining balance due on June 27, 2003 was $1,243,553.13.  Notwithstanding the terms of the March 26, 2003 Note and demands made by CHS that Fastop pay the full amount of the final payment of $1,243,553.13 on June 27, 2003, the date such final payment was due, Fastop failed to make any part of the final payment of $1,243,553.13 due on June 27, 2003, pursuant to the March 26, 2003 Note, and is in default as of June 27, 2003.  (Exh. 1, Cummings

Declar. at ¶ 10; June 20, 2003 letter from CHS attached as Exh. E; June 30, 2003 demand letter from CHS to Fastop attached as Exh. F).

8.      On or about January 21, 2004, CHS filed a Chapter 11 Proof of Claim with the United States Bankruptcy Court for the Central District of Illinois in Fastop's Bankruptcy Case stating the principal amount owed under the March 26, 2003 Note is $1,243,553.13.  (Exh. 1, Cummings Declar. at ¶ 11; Bankruptcy Proof of Claim Form attached as Exh. G).

9.      On or about June 14, 2002, pursuant to the terms of a Participation Agreement executed by Fastop, CHS advanced $275,000.00 to Fastop in First Year Incentive Money, which was an estimate of incentive money CHS would owe to Fastop, calculated as an amount equal to $0.025 per gallon multiplied by Fastop's estimate of the gallons of refined fuel products Fastop would purchase from CHS in the First Year (11,000,000 gallons).  (Exh. 1, Cummings Declar. at ¶ 12; Participation Agreement attached as Exh. H; June 14, 2002 Letter enclosing payment of First Year Incentive Money and monies advanced pursuant to the June 14, 2002 Note, attached as Exh. I; Check for the amount referenced in Exh. I paid to Fastop attached as Exh. J).

10.     Fastop failed to perform its obligations to purchase 11,000,000 gallons of refined fuel products from CHS during the First Year by actually purchasing only 4,880,487 gallons of refined fuel products from CHS in the First Year.  As a result, Fastop was only entitled to receive incentive money from CHS for the First Year in the amount of $122,012.18 (4,880,487 gallons x $0.025 per gallon), and, as such, received an overpayment of $152,987.82.  Pursuant to the Participation Agreement, Fastop understood that "if 1st year volumes are not met, [CHS] will have the option to bill back a portion of any up-front image funds provided."  (Exh. 1, Cummings Declar. at ¶ 13 and Exh. H).

11. On or about January 21, 2004, CHS filed a Chapter 11 Proof of Claim with the United States Bankruptcy Court for the Central District of Illinois in Fastop's Bankruptcy Case stating the amount owed for the First Year Incentive Money is $152,987.82. (Exh. 1, Cummings Declar. at ¶ 14; Bankruptcy Proof of Claim Form attached as Exh. K).

12. On or about October 30, 2002, for good and valuable consideration, Bickhaus executed and delivered to CHS the Guaranty for the benefit CHS to induce CHS to grant credit or assume a credit risk in respect to the sales of goods made by CHS to Fastop, or in respect of any type of transaction by which CHS may become the creditor of Fastop. (Exh. 1, Cummings Declar. at ¶ 15; Guaranty attached as Exh. L).

13. In the Guaranty, Bickhaus agreed to pay to CHS, when due, or upon demand thereafter, with interest, and, without deduction for any claim of set-off, or counterclaim of Fastop, or loss of contribution from any co-guarantor, the full amount of all obligations or indebtedness due CHS from Fastop, together with all expenses of collection and reasonable counsel fees incurred by CHS by reason of a default of Fastop. (Exh. 1, Cummings Declar. at Exh. L).

14. In the Guaranty, Bickhaus agreed that no act or thing need occur to establish the liability of Bickhaus, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate Bickhaus, or modify, reduce, limit or release the liability of Bickhaus. (Exh. 1, Cummings Declar. at Exh. L).

15. In the Guaranty, Bickhaus agreed that the Guaranty is a continuing guaranty, which shall be revocable only as to transactions entered into by CHS, subsequent to the receipt by the Credit Manager of CHS, of a notice of termination, which shall be sent Certified or Registered mail via U.S. Postal Service. (Exh. 1, Cummings Declar. at Exh. L).

16. In the Guaranty, Bickhaus agreed that his obligation under the Guaranty is a primary and unconditional obligation, and covers all existing and future indebtedness of Fastop to CHS.  (Exh. 1, Cummings Declar. at Exh. L).

17. In the Guaranty, Bickhaus agreed that his obligations under the Guaranty shall be enforceable before or after CHS proceeding against Fastop, or against any security held by CHS and shall be effective regardless of the solvency or the insolvency of Fastop.  (Exh. 1, Cummings Declar. at Exh. L).

18. CHS has not received any written notice of termination of the Guaranty from Bickhaus.  (Exh. 1, Cummings Declar. at ¶ 16).

19. Bickhaus, as guarantor of the payment of the unpaid amount of $31,120.89 under the June 14, 2002 Note, has failed and refused to pay the amount of $31,120.89 due and owing pursuant to the terms of the Guaranty.  (Exh. 1, Cummings Declar. at ¶ 17).

20. Bickhaus, as guarantor of the payment of the unpaid amount of $1,243,553.13 under the March 26, 2003 Note, has failed and refused to pay the amount of $1,243,553.13 due and owing pursuant to the terms of the Guaranty.  (Exh. 1, Cummings Declar. at ¶ 18; June 30, 2003 demand letter from CHS to Bickhaus attached as Exh. M).

21. Bickhaus, as guarantor of the payment of the overpaid amount of $152,987.82 in First Year Incentive Money, has failed to pay the overpaid amount of $152,987.82 due and owing pursuant to the terms of the Guaranty.  (Exh. 1, Cummings Declar. at ¶ 19).

22. CHS has incurred, and will continue to incur, attorneys' fees and other legal expenses, in connection with its efforts to enforce the Guaranty and collect the guaranteed amounts from Bickhaus.  (Exh. 1, Cummings Declar. at ¶ 20).

**ARGUMENT**

I.   *Standard of Review for Motions for Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, reveal that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Balderston v. Fairbanks Morse Engine Division of Coltec Indus., 328 F.3d 309, 320 (7th Cir. 2003). Only disputes over facts that might affect the outcome will properly exclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party has the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 322. Once the moving party has carried its burden, its opponents must set forth specific facts demonstrating there is a dispute about a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Liberty Lobby, Inc., 477 U.S. at 247. Furthermore, the nonmoving party may not rely solely on his pleadings but must set forth specific facts showing that there is a genuine issue for trial with regard to those dispositive matters. Id. at 324. See also Balderston, 328 F.3d at 320.

II.   *Bickhaus' Liability Pursuant to Guaranty of Credit*

There can be no good faith dispute that on or about October 30, 2002, Bickhaus executed and delivered the Guaranty[2] to CHS. See Exh. 1, Cummings Declar. at Exh. L. By executing

---

[2] The Guaranty contains a choice-of-law provision, stating that "This Agreement, and all rights, obligations, and duties hereunder, and all disputes which may arise hereunder, shall be construed in accordance with, and governed by, laws of the State of Minnesota, without giving effect to the conflict of laws provisions thereof." Exh. 1, Cummings Declar. at Exh. L. Thus, Minnesota law applies to the legal issues in this case. "Illinois law respects the contract's choice-of-law clause as long as the contract is valid." Vencor, Inc. v. Webb, 33 F.3d 840, 844 (7th Cir. 1994); Kohler v. Leslie Hindman, Inc., 80 F.3d 1181, 1185 (7th Cir. 1996).

this Guaranty, the signatory clearly agreed that the Guaranty was for the benefit of CHS to induce CHS to grant credit or assume a credit risk in respect to the sales of goods made by CHS to Fastop, or in respect of any type of transaction by which CHS may become the creditor of Fastop. By executing this Guaranty, the signatory also agreed that the guarantor's obligation is an unconditional obligation and covers all existing and future indebtedness of Fastop to CHS. There can be no genuine issue of material fact regarding the obligations clearly stated in the Guaranty, which impose upon the signatory an obligation to pay Fastop's debt obligations when due. Id. The only issue that has been raised by Defendant Bickhaus is whether or not he is personally liable for the obligations in the Guaranty. The only evidence cited by Defendant Bickhaus to argue that he is not personally liable is the manner in which he executed the Guaranty: "Christopher Bickhaus as President Fastop, Inc."

In the current case, Bickhaus is the guarantor and is personally liable even though he signed the Guaranty "Christopher Bickhaus as President Fastop, Inc." Under Minnesota law, the debtor does not become a party to the guaranty, and the guarantor is not a party to the principal obligation. Charmoll Fashions, Inc. v. Otto, 248 N.W.2d 717, 719 (Minn. 1976). "The undertaking of the former [debtor] is independent of the promise of the latter [guarantor]; and the responsibilities which are imposed by the contract of guaranty differ from those which are created by the same contract to which the guaranty is collateral." Id.

Based on the holding in Charmoll, Fastop cannot be liable under the Guaranty since it is the debtor on the underlying obligations and is not a party to the Guaranty that Bickhaus signed. Fastop and Bickhaus have, therefore, assumed very different liabilities. Charmoll, 248 N.W.2d at 719. By signing the Guaranty, Bickhaus assumed a personal obligation for Fastop's indebtedness to CHS.

Furthermore, Bickhaus could not have signed the Guaranty on behalf of the company since "[n]o purpose would be served by a corporation guaranteeing its own debt." Johnson Bros. Wholesale Liquor Co. v. Ottos' Liquor Inc., 194 N.W.2d 592, 592 (Minn. 1972). See also McBride Electric, Inc. v. Putt's Tuff, Inc., 685 P.2d 316, 320-21 (Kan. Ct. App. 1984) (finding individuals personally obligated as guarantors on corporate debt, and stating that "[d]efendants' argument that the inclusion of their corporate titles behind their signatures prevents their being personally liable is also without merit" because accepting such an argument "would elevate form over substance" and would "have the untenable result of making the guarantor of the note the same corporation which was primarily liable thereon"); Kordick v. Merchants Nat'l Bank and Trust Co., 496 N.E.2d 119, 124 (Ind. Ct. App. 1986) (although individual signed guaranty as "Robert C. Roy, Pres.," he was personally liable since it would be "meaningless for [the corporation] to guarantee its own debt because it would add nothing to its existing obligation"); Boise Cascade Corp. v. Stonewood Dev. Corp., 655 P.2d 668, 669 (Utah 1982) (corporate representative was personally liable after signing a guaranty since any other interpretation "would result in an absurdity, i.e., that the principal obligor was also the guarantor of his own obligation"); Appliance and Heating Supply, Inc. v. Telaroli, 682 P.2d 867, 868 (Utah 1984) (finding that president of company who signed agreement to pay amounts due if company defaulted was not absolved from personal liability, even though he signed agreement followed by the word "president").

It is clear from the above referenced Minnesota law and case law from other jurisdictions that, as a matter of law, Bickhaus guaranteed Fastop's debt in his individual capacity even though he wrote "as President, Fastop Inc." after he signed his name. Applying the court's rationale in Charmoll clearly demonstrates that Bickhaus is personally liable under the Guaranty.

In <u>Charmoll</u>, the guaranty defined the principal corporate debtor as "the Borrower." <u>Charmoll</u>, 248 N.W.2d at 721. Likewise, the current Guaranty defines Fastop, Inc., as the "Customer." <u>See</u> Exh. 1, Cummings Declar. at Exh. L. In <u>Charmoll</u>, the Court clearly distinguished the principal obligation of the borrower/customer under the terms of the underlying agreement from the primary obligation of the guarantors under the terms of the guaranty. <u>Charmoll</u>, 248 N.W.2d at 719-20. An obligation of a guarantor is "primary" such that the holder of the note can sue the guarantor upon default of the borrower without the necessity of an action against the borrower. <u>Id</u>. at 720. As in <u>Charmoll</u>, the present Guaranty executed by Bickhaus describes Bickhaus' obligation as "a primary and unconditional obligation, and covers all existing and future indebtedness of the Customer to CHS. This obligation shall be enforceable before or after proceeding against the Customer . . . and shall be effective regardless of the solvency or insolvency of the Customer." <u>See</u> Exh. 1, Cummings Declar. at Exh. L. The Guaranty specifically explains the separate obligations imposed on Fastop and Bickhaus. By identifying Fastop as the Customer, it specifically notes that Fastop is the underlying debtor. The Guaranty also specifically alerts Bickhaus that, by executing this Guaranty, he is assuming an obligation of Fastop. As previously stated, "[n]o purpose would be served by a corporation guaranteeing its own debt." <u>Johnson Bros.</u>, 194 N.W.2d at 592. Accordingly, as in <u>Charmoll</u>, Bickhaus – the corporate officer of Fastop – is personally liable under the Guaranty.

Furthermore, any interpretation that does not find Bickhaus personally liable for the obligations of Fastop ignores the plain language of the Guaranty and essentially renders the entire document meaningless. The plain language of the Guaranty makes Bickhaus liable to CHS for the full amount of Fastop's obligations or indebtedness to CHS. Exh 1, Cummings Declar. at Exh. L. It expressly denotes that the signatory is assuming an obligation that, until the

Guaranty was executed, was only an obligation of Fastop. Any reasonable person would understand that, by signing the Guaranty, he or she was creating personal liability under the Guaranty. "People who sign documents which are plainly written must expect to be held liable thereon." Jenista v. Burlington Northern Airmotive, Inc., 388 N.W.2d 770, (Minn. Ct. App. 1986). Indeed, "the language of the guaranty specifically negates the signature as having been made in a representative capacity, and [the individual] was personally obligated on the guaranty agreement." Kordick, 496 N.E.2d at 124.

The language of the Guaranty unambiguously evidences Bickhaus' personal liability. Under these circumstances, signing an agreement in a representative capacity does not create an ambiguity. Although Bickhaus is now claiming that his signature is in his corporate capacity, courts will not construe such a signature as that of the corporation in light of the clear and unambiguous terms of the Guaranty, because such an interpretation "would … have the untenable result of making the guarantor of the note the same corporation which was primarily liable thereon. Such a promise of guaranty would be illusory only." McBride, 685 P.2d at 320-21; Ricker v. B-W Acceptance Corp., 349 F.2d 892, 895 (10th Cir. 1965) (finding that guaranty's language that the "undersigned" had personally guaranteed debt of the company manifested an intent to bind the company president personally and that the company guaranteeing its own debt "would add nothing to its existing obligations" and "would serve no purpose").

As set forth above, there can be no genuine issue of material fact as to whether Bickhaus signed the Guaranty in his individual capacity. Accordingly, the Court should find that Bickhaus is personally liable for all of Fastop's indebtedness to CHS, and summary judgment should be granted in favor of CHS as to Bickhaus' personal liability under the Guaranty as a matter of law.

### III.     *Fastop's Indebtedness to CHS*

In the event this Court finds Defendant Bickhaus is liable to CHS for Fastop's indebtedness pursuant to the terms of the Guaranty executed by Bickhaus, then CHS seeks summary judgment in its favor as to Fastop's indebtedness under the June 14, 2002 Note, the March 26, 2003 Note and the Participation Agreement.

Fastop's indebtedness to CHS stems from Fastop's breach of the foregoing contracts with CHS. Under Minnesota law, in order to show a breach of contract by Fastop, CHS must prove (a) the formation of the contract; (b) performance by plaintiff of any conditions precedent to its right to demand performance by defendant; (c) a breach of the contract by defendant, and (d) resulting damages. Briggs Transp. Co. v. Ranzenberger, 217 N.W.2d 198, 200 (Minn. 1974); Buchman Plumbing, Inc. v. Regents of Univ. of Minnesota, 215 N.W.2d 479, 486 (Minn. 1974). There can be no genuine issue of material fact that Fastop breached the two promissory notes by failing to make full and final payment when due, and breached the Participation Agreement by refusing to pay back the amount owed to CHS for failing to meet the First Year volume estimate of 11,000,000 gallons.

#### A.     *Breach of Promissory Notes*

As set forth above, there can be no good faith dispute that Fastop executed the June 14, 2002 Note for value received. Fastop promised to pay to the order of CHS the principal sum of Seventy Thousand & Five Hundred Dollars ($70,500.00), together with interest on the unpaid principal amount at the rate of six percent (6.00%) per annum. The underlying indebtedness evidenced by the June 14, 2002 Note arose from funds advanced to Fastop by CHS in connection with Fastop's agreement that the petroleum image elements of the seventeen convenience stores referred to in the First Amended Complaint as the Cenex-Identified Sites would be branded

CENEX. CHS delivered to Fastop the full amount of $70,500.00 in the form of a corporate check. The entire remaining balance on the June 14, 2002 Note, including accrued interest, was due and payable in full on or before July 15, 2003. After all just credits were given, the entire remaining balance owed on the June 14, 2002 Note was $31,120.89. Fastop has failed to pay any portion of the unpaid amount of $31,120.89 on the June 14, 2002 Note. Failure to pay this amount on or before July 15, 2003 resulted in Fastop's default under the terms of the June 14, 2002 Note, and CHS had the right to pursue legal or equitable remedies.[3]

As also set forth above, there can be no good faith dispute that Fastop executed the March 26, 2003 Note for value received, promising to pay to the order of CHS the principal sum of $1,360,697.83, together with interest from March 26, 2003, accruing at the rate of 12.0% per year on the unpaid principal amount until paid in full. The underlying indebtedness evidenced by the March 26, 2003 Note arose from the sales of refined fuel products to Fastop by CHS for which Fastop failed to pay when due. The March 26, 2003 Note included a payment schedule that set forth the amounts and due dates of periodic payments to be paid by Fastop to CHS. The final payment on the March 26, 2003 Note was due on June 27, 2003. Fastop has failed and refused to pay any portion of the unpaid amount of $1,243,553.13 on the March 26, 2003 Note. Failure to pay the amount on or before June 27, 2003, resulted in Fastop's default under the terms of the March 26, 2003 Note, and CHS had the right to pursue legal or equitable remedies.[4]

---

[3] On or about January 21, 2004, CHS filed a Chapter 11 Proof of Claim with the United States Bankruptcy Court for the Central District of Illinois in Fastop's Bankruptcy Case stating the principal amount owed under the June 14, 2002 Note is $31,120.89. During the course of the Chapter 11 proceeding, Fastop never objected to such Proof of Claim.

[4] On or about January 21, 2004, CHS filed a Chapter 11 Proof of Claim with the United States Bankruptcy Court for the Central District of Illinois in Fastop's Bankruptcy Case stating the principal amount owed under the March 26, 2003 Note is $1,243,553.13. During the course of the Chapter 11 proceeding, Fastop never objected to such Proof of Claim.

No genuine issues of material fact exist on the issue of whether Fastop breached the two promissory notes with CHS by failing to pay the remaining balances when due in accordance with the terms of the two promissory notes. These two promissory notes are valid, ordinary money contracts, where the consideration has passed and CHS has performed all of its obligations. First State Bank of Floodwood v. Jubie, 86 F.3d 755, 760 (8th Cir. 1996) (applying Minnesota law). CHS has shown (a) the formation of the contracts; (b) performance by plaintiff; (c) a breach of the contracts by Fastop, and (d) resulting damages. Briggs, 217 N.W.2d at 200; Buchman Plumbing, 215 N.W.2d at 486. Thus, CHS has established all the essential elements of a breach of contract by Fastop, and CHS is permitted to pursue any damages that naturally and necessarily result from such breach. Logan v. Norwest Bank, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999).

B.  *Breach of Participation Agreement*

There can be no good faith dispute that CHS advanced $275,000.00 to Fastop pursuant to the terms of the Participation Agreement, which was an amount equal to $0.025 per gallon multiplied by Fastop's estimate of the gallons of refined fuel products it would purchase from CHS in the First Year (11,000,000 gallons). Fastop failed to perform its obligation to purchase 11,000,000 gallons of refined fuel products from CHS during the First Year by actually purchasing only 4,880,487 gallons of refined fuel products from CHS in the First Year. As a result, Fastop was only entitled to receive incentive money from CHS for the First Year in the amount of $122,012.18 (4,880,487 gallons x $0.025 per gallon), and, as such, received an overpayment of $152,987.82. Pursuant to the Participation Agreement, Fastop understood that "if 1st year volumes are not met, [CHS] will have the option to bill back a portion of any up-front image funds provided." Exh. 1, Cummings Declar. at Exh. H. Therefore, Fastop was

obligated to reimburse CHS the amount of the overpayment pursuant to the Participation Agreement. Id. Failure to reimburse CHS the amount of $152,987.82 resulted in a breach of the Participation Agreement and a benefit to Fastop to which it was not entitled.[5]

With regard to the Participation Agreement, no genuine issues of material fact exist on the issue of whether Fastop breached such agreement. CHS has shown: (a) the formation of the contract; (b) performance by plaintiff; (c) a breach of the contract by Fastop; and (d) damages. Briggs, 217 N.W.2d at 200; Buchman Plumbing, 215 N.W.2d at 486. Thus, CHS has established all the essential elements of a breach of contract by Fastop, and CHS is permitted to pursue any damages that naturally and necessarily result from such breach. Logan v. Norwest Bank, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999).

## CONCLUSION

For all of the foregoing reasons, CHS Inc., formerly known as Cenex Harvest States Cooperatives, respectfully requests that this Court enter an Order granting summary judgment in favor of CHS as to Defendant Bickhaus' personal liability for Fastop's indebtedness pursuant to the terms of the Guaranty executed by Bickhaus. In the event this Court finds Defendant Bickhaus is liable to CHS for the indebtedness of Fastop pursuant to the Guaranty, then CHS requests summary judgment as to the amount of damages owed to CHS by Bickhaus ((1) $31,120.89, plus interest, pursuant to the June 14, 2002 Note in the amount of; (2)

---

[5] On or about January 21, 2004, CHS filed a Chapter 11 Proof of Claim with the United States Bankruptcy Court for the Central District of Illinois in Fastop's Bankruptcy Case stating the amount owed for the First Year Incentive Money is $152,987.82. During the course of the Chapter 11 proceeding, Fastop never objected to such Proof of Claim.

$1,243,553.13, plus interest, pursuant to the March 26, 2003 Note in the amount of; and (3) $152,987.82 pursuant to the Participation Agreement.)[6]

Respectfully submitted,

GREENSFELDER, HEMKER & GALE, P.C.

By _____
Dawn M. Johnson  (Ill. Bar #06126582)
Lead Counsel
10 South Broadway, Suite 2000
St. Louis, Missouri  63102
(314) 241-9090
(314) 241-4245 (fax)

Attorneys for Plaintiff CHS Inc., formerly known as Cenex Harvest States Cooperatives

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was sent by U.S. Mail, postage prepaid, this _____ day of October, 2004, to **David G. Penn, Esq.,** Schmiedeskamp, Robertson, Neu & Mitchell, Attorneys for Defendant, 525 Jersey Street, P.O. Box 1069, Quincy, Illinois  62306-1069.

_____

---

[6] Through a post-judgment Motion for Attorneys' Fees and Costs, and with approval of the Court, CHS will submit evidence of its attorneys' fees and costs incurred in this matter that are properly recoverable pursuant to the terms of the Guaranty.