**E-FILED**
Monday, 04 October, 2004 05:39:51 PM
Clerk, U.S. District Court, ILCD

# Country *ENERGY*, LLC

An Agent For Cenex Harvest States Cooperatives

Account # 26766  Sims
515149

## BRANDED REFINED FUELS AND LUBRICANTS
## MASTER MARKETING AGREEMENT

THIS AGREEMENT is made effective as of this ___01__ day of ___MAY_____ _2002_ by and between Cenex Harvest States Cooperatives ("CHS") or "Supplier, 5500 Cenex Drive, Inver Grove Heights, Minnesota 55077, acting through its exclusive agent, Country Energy, LLC ("Country Energy"), and, __Haslot Convenience Stores, Inc._, a __Corporation_____, whose address is __823 North 12th__, __Quincy__, __Illinois__ __62301__ ("Customer").

## RECITALS

**Whereas,** CHS, through its agent, Country Energy, sells refined fuel products and lubricating oils under certain trademarks, service marks, logos, trade names, commercial symbols or trade dress, or any combination thereof, designated by Supplier from time to time to be used to indicate that the refined fuel products and lubricating oils were supplied by Country Energy, as agent for CHS, to customers of CHS (the "Mark(s)").

**Whereas,** Customer desires to purchase refined fuel products and lubricating oils from Supplier, and sell such refined fuel products and lubricating oils to its customers.

**Whereas,** Supplier desires to sell refined fuel products and lubricating oils to Customer, subject to the terms and conditions of this Agreement.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants and promises contained herein, the parties agree as follows:

### 1.    PRODUCTS AND QUANTITIES.

**(a)    Purchase and Sale of Products.** Subject to the terms and conditions of this Agreement, during the term of this Agreement, Supplier agrees to sell and deliver, and Customer agrees to purchase and accept delivery of, certain "Products", which term is defined to include the following products designated by Supplier to carry one or more of the Marks: (i) refined fuel products, including but not limited to various grades of gasoline, premium diesel fuel, and other distillates ("Refined Fuel Product(s)"); (ii) lubricating oils, including but not limited to engine lubricating oils, transmission lubricating oils, gear case lubricating oils, and greases ("Lubricants"); and (iii) such other related products designated or developed by Supplier at any time and from time to time in its energy products marketing program; provided, however that the parties specifically agree that propane is not included in the definition of "Products". In Exhibit A attached hereto and incorporated herein, Customer hereby makes its good faith estimate of its quantities and its Supply Points of its purchase of Refined Fuel Products from Supplier. Amendments to this Exhibit A may be made by mutual written agreement, which to be effective must be signed by Supplier.

**(b)    Quantities of Refined Fuel Products.** Customer has the right to purchase in each calendar month the quantity of each category of Refined Fuel Product at the Supply Points as set forth in Exhibit A, as amended from time to time. Customer shall purchase in each month no less than eighty five percent (85%) (the "Minimum") and no more than one hundred and fifteen percent (115%) (the "Maximum") of the quantity of each category of Refined Fuel Product for each month as set forth in Exhibit A, from time to time.

**(c)    Failure to Purchase Minimum or Maximum Quantities.** In the event that Customer purchases less than the Minimum of the quantity of any category of Refined Fuel Product as set forth in Exhibit A, as amended from time to time, in any two of the three months in a calendar quarter, or more than the Maximum of the quantity of any category of Refined Fuel Product as set forth in Exhibit A, from time to time, in any two of the three months in a calendar quarter, then, notwithstanding anything to the contrary herein, Supplier shall have the options, at its discretion, to: (i) terminate this Agreement as provided in Section 2 below; or (ii) prepare and deliver to Customer a revised Exhibit A which reflects the revised quantities of Refined Fuel Products that Supplier is willing to accept on Exhibit A thereafter.

(i)  In the event that Customer has purchased less than the Minimum of the quantity of any category of Refined Fuel Product in any two of the three months in a calendar quarter, and Supplier desires to decrease the quantities of Refined Fuel Products as set forth in Exhibit A to the actual purchases by Customer in each month of such calendar quarter, such decrease in the quantities of Refined Fuel Products as set forth in such revised Exhibit A sent by Supplier to Customer shall be binding on Customer.

(ii)  In the event that Customer has purchased less than the Minimum of the quantity of any category of Refined Fuel Product in any two of the three months in a calendar quarter, and Supplier desires to decrease the quantities of Refined Fuel Products as set forth in Exhibit A to quantities different than the

CHS 000051

**Exhibit**

**A**

actual purchases by Customer in each month of such calendar quarter, such decrease in the quantities of Refined Fuel Products as set forth in such revised Exhibit A sent by Supplier to Customer will not be binding on Customer unless Customer has agreed to accept such decrease, provided however that Customer agrees to negotiate in good faith with Supplier to agree upon revised quantities of Refined Fuel Products to be set forth in Exhibit A.

(iii) In the event that Customer has purchased more than the Maximum of the quantity of any category of Refined Fuel Product in any two of the three months in a calendar quarter, and Supplier desires to increase the quantities of Refined Fuel Products as set forth in Exhibit A, such increase in the quantities of Refined Fuel Products as set forth in such revised Exhibit A sent by Supplier to Customer will not be binding on Customer unless Customer has agreed to accept such increase, provided however that Customer agrees to negotiate in good faith with Supplier to agree upon revised quantities of Refined Fuel Products to be set forth in Exhibit A.

(iv) Upon any change in the quantities of Refined Fuel Products as set forth in the existing Exhibit A, the parties agree to promptly execute a revised Exhibit A reflecting such change in quantities.

(v) Notwithstanding anything to the contrary herein, Supplier shall not be obligated to sell to Customer quantities of any category of Refined Fuel Product in excess of the Maximum quantities as set forth in Exhibit A, as amended from time to time, in any month, even if Supplier had made available to Customer quantities in excess of the Maximum in any preceding month or months.

(d) **Delivery Schedule.** Customer shall make reasonable efforts to take delivery of the monthly quantities of Refined Fuel Products as set forth in Exhibit A, as amended from time to time, at regular weekly intervals during each month.

(e) **Volume Measurement of Refined Fuel Products.** Quantities of Refined Fuel Products shall be determined by one of the following two methods, as selected by Customer once per calendar year, unless state law requires otherwise: (i) volumetric measurements of such Refined Fuel Products as actually loaded, measured at the point of shipment ("gross"); or (ii) volumetric measurements of such Refined Fuel Products as described immediately above, but with the gross volume corrected for temperature to a sixty degree Fahrenheit ($60°$ F) basis or such other temperature-compensated basis in accordance with current ASTM-IP Petroleum Measurement Tables ("net"). Once per calendar year, unless state law requires otherwise, Customer shall have an option to change in a reasonable manner the method of measurement from one of the methods set forth herein to the other method set forth herein, to be effective as of the next succeeding anniversary date of this Agreement. Customer's election to change from one method to the other shall be made in writing to Supplier at least thirty (30) days in advance of the next anniversary date of the effective date hereof.

(f) **Supply Points.** In the event Supplier discontinues, for whatever reason, making a supply of Refined Fuel Products available at any Supply Point set forth in Exhibit A, as amended from time to time ("Discontinued Supply Point"), then with respect to Refined Fuel Products to have been delivered at the Discontinued Supply Point, Supplier shall have the option to substitute a Supply Point for the Discontinued Supply Point for the quantities of Refined Fuel Products which would have otherwise been delivered at the Discontinued Supply Point. In the event Supplier elects to substitute a Supply Point for the Discontinued Supply Point, and Customer determines that the substituted Supply Point is not acceptable to Customer, then the Customer shall, at its option and as its sole and exclusive remedy, have the right to terminate this Agreement as to all or a portion of those quantities of such Refined Fuel Products for which a substituted Supply Point was designated. Customer must provide Supplier written notice of its exercise of such option within thirty (30) days from the date of the notice to Customer from Supplier specifying the substituted Supply Point. In the event Customer elects a partial termination of this Agreement pursuant to provisions of this subsection, this Agreement shall remain effective for all other Supply Points and purposes.

(g) **Related Products.** Supplier may at any time and from time to time sell and deliver to Customer any related product(s) not currently included in its energy products marketing program. All such sales and purchases shall be upon terms and conditions set forth herein, except as may be mutually agreed in writing. Notwithstanding anything to the contrary herein, the parties specifically agree that the sale by Supplier and purchase by Customer of any propane shall be governed by terms and conditions of a Propane Business, Safety and Master Marketing Agreement to be executed by Supplier and Customer.

(h) **Change and/or Discontinuance of Product.** Supplier, in its sole discretion for good faith business reasons, at any time may: (i) discontinue the production, distribution or sale of any Product for its entire system or in a given region; (ii) change the specifications of any Product; (iii) replace any Product with another Product; and/or (iv) withdraw the application of any Mark to any Product. Supplier shall not be liable to Customer by reason of any discontinuance, change, replacement, or withdrawal. Supplier shall give Customer thirty (30) days written notice in the event of any such discontinuance, change, replacement, or withdrawal of a Product, and Customer shall have the option to terminate this Agreement upon thirty (30) days written notice, if such occurrence would work an undue hardship on Customer.

(i) **Market Withdrawal.** In the event Supplier elects to withdraw from the marketing of any Product(s) or otherwise determines to alter its marketing procedures with respect to any Product(s) in a relevant geographic market area served by Customer, Supplier may terminate or not renew this Agreement at any time without further liability by giving Customer at least ninety (90) days prior written notice. Upon receipt of the notice of termination or non-renewal, Customer may terminate this Agreement at any time prior to the expiration of said ninety (90) day period by giving written notice of termination to Supplier.

2. **TERM OF AGREEMENT; TERMINATION.**

(a) **Term.** This Agreement shall take effect only after it has been signed by authorized representatives of both parties, and the effective date shall be the date first

CHS 000052

appearing at the beginning of this Agreement. The initial term of this Agreement shall be five (5) years. Upon expiration of such initial term, the term of this Agreement shall be extended automatically for successive one (1) year terms. Notwithstanding the above: (i) the initial term or any extended term may be terminated as provided in subsections (b) and (c) below; and (ii) either Supplier or Customer may terminate this Agreement at any time, for any reason or no reason, after giving the non-terminating party at least ninety (90) days prior written notice of its intent to terminate this Agreement. Customer shall have no contractual right, and Supplier shall have no obligation, to renew this Agreement other than as explicitly set forth above.

(b)    **Early Termination by Supplier.** At its sole option, notwithstanding any other provision of this Agreement, Supplier may terminate this Agreement in its entirety or as to any one or more Approved Fueling Outlet (as such term is defined in Section 4(a) herein) for any breach of this Agreement by Customer or on any grounds and upon the other terms as permitted by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.*, as amended from time to time, cases decided thereunder, or any successor act ("PMPA"). A summary of the PMPA is set forth on Exhibit B, attached hereto and incorporated herein. In the event that the PMPA is not applicable in a particular case, and Customer fails or refuses to comply with any provision of this Agreement, then Supplier shall have the right to elect to terminate this Agreement in its entirety or as to any one or more Approved Fueling Outlet and shall give Customer thirty (30) days written notice prior to the effective date of termination, setting forth the reasons for termination. Customer shall have the right to cure the breach within fifteen (15) days of the date of the notice. If said breach is cured within such period, the notice of termination to Customer shall be void. However, if the breach is not cured within such period, the termination shall be effected. For the purpose of illustration but not limitation, the parties specifically agree that it would be reasonable for Supplier to terminate this Agreement upon the occurrence of any of the following events: (i) if Customer purchases less than the Minimum of the quantity of any category of Refined Fuel Product as set forth in Exhibit A, as amended from time to time, in any two of the three months in a calendar quarter during the term of this Agreement, or more than the Maximum of the quantity of any category of Refined Fuel Product as set forth in Exhibit A, as amended from time to time, in any two of the three months in any calendar quarter during the term of this Agreement; (ii) the failure of Customer to pay Supplier in a timely manner when due all sums to which Supplier is entitled under the terms of this Agreement; (iii) fraud or criminal misconduct by Customer relevant to the operation of the Approved Fueling Outlet(s); (iv) the institution of receivership, bankruptcy, or other insolvency proceedings regarding the Customer or its business; (v) the incompetence, incapacity or inability of Customer to provide for the continued operation of the Approved Fueling Outlet(s); (vi) the adulteration, mislabeling, or misbranding of any of the Products or any other misuse of any Marks by Customer; (vii) the failure of Customer to comply with the image requirements provided in Section 4 herein; (viii) the withdrawal by Supplier from the marketing of any Product(s) as provided in Section 1(i) herein; (ix) the failure of Customer to comply with the requirements set forth in Section 11 herein pertaining to the adherence to all applicable laws and regulations; (x) the failure of Customer to secure and maintain the insurance coverage as provided in Section 10 herein; (xi) the abandonment by Customer of the operations contemplated by this Agreement; or (xii) the failure

of Customer to comply with any other provision herein which is both reasonable and of a material significance to the relationship between Supplier and Customer. The exercise by Supplier of any rights reserved under this subsection shall be without prejudice to any claim for damages or for any other right under this Agreement or applicable law.

(c)    **Early Termination by Customer.** In the event that Supplier materially fails or refuses to comply with any provision of this Agreement, then Customer shall have the right to elect to terminate this Agreement and shall give Supplier thirty (30) days written notice prior to the effective date of termination, setting forth the reasons for termination. Supplier shall have the right to cure the breach within fifteen (15) days of the date of the notice, unless under the circumstances a cure is not possible in such time, and then this Agreement shall continue in effect so long as Supplier shall commence curing the breach within the cure period, and diligently pursue a cure of such breach. If said breach is cured, or cure is commenced within such period, the notice of termination to Supplier shall be void. However, if the breach is not cured, or cure is not commenced within such period, the termination shall be effected. The exercise by Customer of any rights reserved under this subsection shall be without prejudice to any claim for damages or any other right under this Agreement or applicable law.

(d)    **Survival.** All obligations, promises and agreements of Customer that expressly or by their nature survive the expiration or termination of this Agreement, including but not limited to Customer's monetary obligations, and indemnification obligations set forth in Section 13 herein, shall continue in full force and effect subsequent to and notwithstanding expiration or termination until they are satisfied, or by their nature expire.

3.    **PRICE AND PAYMENT.** Supplier shall invoice, and Customer shall pay for, Products sold and delivered hereunder, at posted prices established by Supplier for such Products in effect at the time and place of each delivery of Products to Customer, except as provided in subsection (g) below.

(a)    **Price Changes.** Supplier reserves the right to change its posted prices at any time without any prior notice to Customer. Supplier shall notify Customer of price changes via the system(s) utilized in the customary manner by Supplier in the ordinary course of its business from time to time.

(b)    **Price Basis.** Prices shall be in accordance with the following: (i) FOB the Supply Point for all Refined Fuel Products; (ii) FOB delivered at the specific location designated by Customer for all Lubricants, subject to the specific terms of the Supplier's freight program in effect on the date of shipment; and (iii) as agreed for all other Products. For Refined Fuel Products delivered at Supply Points, Customer shall be solely responsible to arrange and pay for transport from such Supply Point and for all costs, expenses, and liabilities of any nature whatsoever occasioned by or arising out of such transport. Customer agrees that it (including all carriers acting on its behalf) will comply with all applicable loading instructions, procedures, and regulations pertaining to loading Refined Fuel Products at each such Supply Point.

CHS 000053

3

(c)    Taxes. Customer agrees that any and all taxes, duties; tolls, fees, charges, or other similar charges (the "Taxes"), now or hereafter imposed by any federal, state, and/or local governmental unit or tribal authority upon, measured by, or incident to, the transportation, importation, production, manufacture, transfer, use, or ownership of Products that are the subject matter of this Agreement, shall be the sole liability and responsibility of Customer, and in the event that Country Energy, and/or CHS, is obligated to pay any such Taxes, Customer shall promptly reimburse Supplier for Taxes paid by Country Energy, and/or CHS.

(d)    Payment. Invoices from Supplier to Customer for Products sold and delivered hereunder will due for payment in full according to terms established for Customer as indicated on each invoice and as provided in the Supplier's credit policy (as revised or amended through the term of this Agreement). Supplier may extend credit to Customer on such terms as Supplier may specify from time to time, and unless Supplier extends credit to Customer, Customer shall pay, at Supplier's option, cash in advance or cash at time of delivery for Products purchased hereunder. Supplier reserves the right to modify or withdraw such credit terms at any time, for any or no reason, upon notice to the Customer.    Amounts not paid in accordance with the remittance terms will be considered overdue, and finance charges will be assessed on overdue amounts, at an annual percentage rate in effect at that time, in accordance with applicable law and finance charge policies of Supplier in effect on the date of delivery.

(e)    Financial Responsibility; Right of Offset. If Customer's payments to Supplier are in arrears, or if the financial responsibility of Customer has become impaired or unsatisfactory in Supplier's reasonable judgment, then advance cash payment or satisfactory security shall be given by Customer to Supplier upon its demand, and deliveries of Products may be withheld by Supplier until such payment or other security is received. Supplier may exercise a right of offset with respect to any payment or obligation due Supplier from Customer under this Agreement or any agreement between Supplier and Customer, against any payment, delivery or other obligation owed by Supplier to Customer under this Agreement or any agreement between Supplier and Customer. The exercise by Supplier of any rights reserved under this subsection shall be without prejudice to any claim for damages or for any other right under this Agreement or applicable law.

(f)    Other Price-Related Terms. The terms and conditions of this Agreement shall, in all cases, prevail over any purchase order relating to Products purchased by Customer pursuant to this Agreement. Invoices sent to the Customer from Supplier, along with delivery tickets and other pertinent documents relating to the sale of Products to Customer pursuant to this Agreement, shall be prima facie evidence of deliveries, quantities, and prices of such sales of Products to Customer.

(g)    Fixed Price Contracts. The parties acknowledge that they may enter into fixed price contracts from time to time, which cover the sale of Refined Fuel Products by Supplier to Customer. In the event that the parties enter into any such fixed price contracts, Customer specifically agrees that all the terms and conditions of this Agreement shall apply to all such fixed price contracts, except that the price for the quantities of Refined Fuel Products covered by such fixed price contracts shall not be the posted price established by Supplier for such Refined Fuel Products in effect at the time and place of delivery of such Refined Fuel Products to Customer, but rather, shall be the price set forth in such fixed price contract.

4.    BRAND PROTECTION.

(a)    Use of Marks. CHS and Country Energy grant Customer, during the term of this Agreement, the non-exclusive and non-transferable right to use the Marks in connection with retail sales of Products that were purchased by Customer from Supplier pursuant to this Agreement through certain retail outlets, approved by Supplier ("Approved Fueling Outlet(s)"), which are individually set forth, along with Customer's good faith estimate of quantities of Refined Fuel Products to be sold at each Approved Fueling Outlet, in a separately executed Exhibit C, attached hereto and incorporated herein. Customer shall only have the right to use Marks at Approved Fueling Outlets. Additional Approved Fueling Outlets may be added only when approved by Supplier, evidenced by the parties' execution of a separately executed Exhibit C.

(i) Customer acknowledges that the Marks are a valuable property right owned by Country Energy and/or CHS, and are essential to the reputation developed by Country Energy and CHS. Customer's rights under this Agreement to use the specified Marks does not vest in Customer any title in such Marks or the goodwill associated with or symbolized by the Marks, nor entitle Customer to any payment or reimbursement from Country Energy or CHS, for same upon the termination or non-renewal of this Agreement or any notice by Country Energy and/or CHS to discontinue use of such Marks.

(ii) Customer's use of Marks shall at all times comply with the Country Energy and CHS published image and identification policies and specifications concerning proper use of the Marks. Customer shall not use, nor permit the use of, any Mark in any way which would alter, destroy or prejudice Country Energy's and/or CHS' title to such Mark.

(iii) Customer's use of the Marks shall be for the sole purpose of properly identifying and advertising Products purchased by the Customer pursuant to this Agreement that are subsequently sold on a retail basis to end users of such Products. Customer shall not permit any Approved Fueling Outlet to sell or to offer for sale any refined fuels products supplied to Customer by any party other than Supplier.

(iv) Except as may be specifically provided for from time to time in one or more Distributor/Dealer Marks Agreements separately executed between Supplier, Customer, and a third party, Customer shall neither use the Marks in connection with the sale of Products to any resellers, jobbers, or distributors, nor assign the right to use a Mark, sublicense a Mark, or otherwise permit any other party to make use of the Marks.

4

CHS 000054

(v) Customer shall not permit any Refined Fuel Products to be distributed under the Marks to be mixed or in any way adulterated with any other refined fuels products, other products or chemicals, except as may be expressly authorized in writing by Supplier. Supplier hereby consents to Customer's blending of ethanol or other approved oxygenates, or approved lead substitutes, with the Refined Fuel Products, subject to requirements imposed by Supplier from time to time. Customer shall maintain the quality and purity of all Products sold to it hereunder, and agrees to implement programs of oversight and sampling of all Refined Fuel Products to ensure compliance with all requirements pertaining to the proper handling of such Refined Fuels Products.

(b) **Infringement of Marks.** Customer shall immediately notify Supplier in writing of any apparent infringement of, or challenge to, Customer's use of any Mark, and/or of any claim by any person of any rights in any Mark of which Customer becomes aware, and shall fully cooperate with Supplier in any investigation of any alleged infringement of Country Energy's and/or CHS' ownership rights of the Marks. Customer shall not directly or indirectly communicate with any person other than Country Energy and CHS, and their respective counsel, in connection with any such infringement, challenge or claim. As between Supplier and Customer, Supplier shall have sole discretion to take such action as it deems appropriate, and the sole right to exclusively control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising out of such infringement, challenge or claim relating to any Mark. Customer agrees to execute any and all instruments and documents, to render such assistance, and to do such acts and things as Supplier deems necessary or advisable to protect and maintain the interests of Country Energy and CHS, in any such event.

(c) **Customer's Obligations to Discontinue Use of Marks.** In the event that Customer sells or offers to sell any refined fuels products supplied to Customer by any party other than Supplier at any Approved Fueling Outlet, or upon a request from Supplier and/or upon expiration or termination or non-renewal of this Agreement, for any reason, as a step to prevent possible confusion to the public, Customer shall immediately remove, cover, or otherwise obliterate the color and word identification of all Marks from all Approved Fueling Outlets, trucks, bulk plants, bulk tanks, and any other facilities and/or equipment used by Customer in its Refined Fuel Products and/or Lubricants business. If Customer fails to so remove, cover, or obliterate any such identification of the Marks, Supplier shall have the absolute right, without notice or any liability whatsoever to Customer, and at Customer's sole expense, to enter upon Customer's premises to cause such identification to be removed, covered, obliterated, or painted over a neutral color designated by Supplier, using such means as Supplier deems reasonable under the circumstances.

(d) **Image Maintenance.** Customer agrees to comply with the CHS and Country Energy image and identification policies concerning use of the Marks, including, but not limited to, the CHS and Country Energy Identification Manuals and Image Policies in effect from time to time. Customer shall maintain the Approved Fueling Outlet(s) as clean, safe, and healthful operations to the highest standards of comparable businesses and in strict conformance with all requirements, instructions, directions and specifications of CHS and Country Energy. Customer shall maintain all aspects of the Approved Fueling Outlet(s), including buildings, rest rooms, driveways, grass or planting areas, and storage areas in good, clean, neat, safe, uncluttered, unobstructed, and healthful conditions with all necessary painting and repairs made to such Approved Fueling Outlets(s). Customer shall keep all driveways and fueling areas of the Approved Fueling Outlet(s) clear of repaired vehicles, damaged vehicles, or other obstacles which may prevent easy access to the public. Customer shall keep all equipment at the Approved Fueling Outlet(s) neat, clean and in good repair. Customer shall keep all fuel dispensers of Refined Fuel Products properly identified with the appropriate Mark(s) and any other labels which may be required by applicable laws, rules, and regulations. Employees at the Approved Fueling Outlet(s) shall at all times present a good personal appearance, observe clean, neat and safe working habits, render prompt, courteous and honest treatment to customers, and take reasonable action to promote the sale of the Products. Customer will maintain reasonable hours of operation at the Approved Fueling Outlet(s) and will provide a standard of service comparable to other branded refined fuels products and lubricants customers of Supplier, and consistent with similar facilities located in the vicinity of the Approved Fueling Outlet(s).

(e) **Amendment and/or Discontinuance of Mark.** Supplier, in its sole discretion for good faith business reasons, at any time may: (i) discontinue the use of any Mark; (ii) change any Mark; (iii) replace any Mark with another mark or Mark; and/or (iv) withdraw the application of any Mark to the Approved Fueling Outlet(s). Supplier shall not be liable to Customer by reason of any discontinuance, change, replacement, or withdrawal. Supplier shall give Customer thirty (30) days written notice in the event of any such discontinuance, change, replacement, or withdrawal of a Mark, and Customer shall have the option to terminate this Agreement upon thirty (30) days written notice, if such occurrence would work an undue hardship on Customer.

(f) **Supplier's Right to Inspect.** Customer grants Supplier the right to enter, inspect and take fuel samples from all Approved Fueling Outlets, trucks, bulk plants, bulk tanks, and any other facilities and/or equipment used by Customer in its Refined Fuel Products and/or Lubricants business, as may be reasonably required by Supplier to determine Customer's compliance with all of the provisions of this Section 4.

(g) **Violations.** Customer specifically agrees that any failure to strictly comply with all of the provisions of this Section 4 shall be considered a material breach of this Agreement, and constitute grounds for termination of this Agreement as provided in Section 2 above.

5. **TITLE.** To the full extent permitted by law, Supplier and Customer agree that title to, risk of loss and all liability with respect to all Products sold and delivered hereunder shall pass from Supplier to Customer, in general, as follows: (a) at the Supply Point for all Refined Fuel Products as the Refined Fuel Products enter the receiving connection of transport equipment provided by Customer; (b) when delivered at the specific location designated by Customer for all Lubricants; and (c) as agreed for all other Products.

6. **CLAIMS.** Products purchased hereunder may not be returned for credit or exchange for other products without

5

CHS 000055

Supplier's written consent. In the event that Customer has any complaints or objections as to the quantity or quality of Products delivered hereunder, Customer shall immediately (but in no event later than ten (10) days after the basis for such complaint or objection occurred) notify Supplier, make such Products available to Supplier for its investigation, and request instructions for handling such Products. Any such notification shall state with particularity the basis for such complaint or objection. In the event that Customer fails to comply with the provision of this Section, and/or fails to follow Supplier's instructions for handling the Products, it shall be deemed to have waived any complaint or objection as to such Products.

**7.      WARRANTIES/DISCLAIMER.**      Supplier warrants that it will convey good title to the Products sold and delivered hereunder, and that all such Products shall be merchantable, and in compliance with the specifications expressly applicable to the Products in effect at the time of delivery of the Products. The foregoing warranties are exclusive of all other warranties, whether written, oral or implied, and except for the foregoing, NONE OF COUNTRY ENERGY OR CHS MAKE ANY WARRANTIES OF ANY KIND AS TO THE PRODUCTS DELIVERED TO THE CUSTOMER UNDER TERMS OF THIS AGREEMENT, EXPRESS AND/OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

**8.      LIMITATION OF LIABILITY.**      The parties specifically agree that Customer's exclusive remedy for any and all losses or damages resulting from Supplier's sale and delivery of Products, and activities associated with such sale and delivery of Products, including but not limited to a claim of breach of warranty, breach of contract, negligence or strict liability, shall be limited to the replacement value of the specific Products delivered for which such claim is proved. UNDER NO CIRCUMSTANCES SHALL COUNTRY ENERGY OR CHS BE LIABLE TO CUSTOMER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES.

**9.      FORCE MAJEURE; ALLOCATION.**      Neither party shall be liable to the other party for any demurrage, loss or damage resulting from any delay or failure to make or accept deliveries caused by or arising out of acts of God or the elements, wars, public disorders, storms, sabotage, strikes, labor difficulties, governmental proration or regulation, when raw materials or supplies are interrupted, unavailable, or in short supply, and/or any other cause beyond such party's commercially reasonable control. In the event that a party gives notice and an explanation of such force majeure to the other party within a reasonable time after the occurrence of the force majeure event, the obligations of the parties shall be suspended from the date of such force majeure event and for the continuance of any inability to perform so caused. Without limiting the foregoing, Supplier shall not be required to remove such cause or replace the affected source of supply of Products if it shall involve additional capital expense or a departure from Supplier's normal procedures. Customer specifically agrees that nothing contained in this Section shall be construed to relieve Customer of its obligations to promptly pay Supplier in full for Products delivered to it or to pay other monetary obligations of Customer hereunder. In the event of any of the aforementioned events, Supplier may allocate its available supplies of Products among its customers in such manner, and at such time, as Supplier may, at its complete, unfettered and

absolute discretion determine, and it shall not be obligated to purchase other supplies of Products or to in any way make up any Products not delivered to Customer, and shall have no liability to Customer for any loss or damage claimed by Customer as a result of such an allocation.

**10.      INSURANCE.** Customer agrees to maintain at all times during the term of this Agreement the following insurance coverage:      (a) Worker's Compensation and Employers' Liability Insurance as prescribed by applicable law; (b) Comprehensive or Commercial General Liability (Bodily Injury and Property Damage), including liability insurance on all motor vehicles used by Customer, whether or not owned by Customer, with limits of not less than One Million Dollars ($1,000,000) (or higher limits as may be required by law) for all liability arising out of injury to or death of one or more persons in any one occurrence, and One Million Dollars ($1,000,000) (or higher limits as may be required by law) for all liability arising out of damage to or the destruction of property, including loss of use, in any one occurrence, and which includes the following supplementary coverage: (i) contractual liability to cover liability assumed under this Agreement; (ii) Product and Completed Operations Liability Insurance; and (iii) Broad Form Property Damage Liability Insurance. The Comprehensive or Commercial General Liability policies providing for such insurance shall contain a waiver of subrogation against Country Energy and CHS, and shall provide that the insurer shall provide Supplier with at least thirty (30) days written notice prior to the effective date of any cancellation or material change of such policies. Customer agrees, that upon any request from Supplier, it will instruct its insurer to promptly provide Supplier with certificates of insurance evidencing coverage as required by this Section.

**11.      COMPLIANCE    WITH    SAFETY    AND ENVIRONMENTAL LAWS.**

      **(a)      Governmental Laws.** Customer agrees that all its employees, representatives, and agents shall comply, at all times, with all safety and environmental laws, ordinances, rules, and regulations as established by any federal, state, and local authority with jurisdiction over such matters (the "Laws"). Without limiting the foregoing, Customer agrees that it shall comply with all Laws concerning the receipt, storage, and dispensing of motor fuels, the disposal of waste materials, and underground storage tanks. At such times as may be requested by Supplier, Customer shall provide proof that all storage tanks have been registered with the proper state authorities and that Customer meets the applicable state and federal financial responsibility requirements.

      **(b)      Supply Point Rules and Regulations.** Customer agrees that all its employees, representatives, and agents shall comply, at all times, with all applicable safety and environmental rules and regulations established by operators of all Supply Points at which Refined Fuel Products are delivered to Customer, when such employees, representatives, or agents are physically at any such Supply Points.      Customer specifically agrees that in the event that any Refined Fuel Products delivered pursuant to this Agreement are spilled or otherwise escapes during the loading of any transport vehicles at a Supply Point, Customer shall take such measures as are reasonably necessary to protect against or mitigate any resulting pollution damage.

6

CHS 000056

(c)    **Material Safety Data Sheet.** Customer specifically acknowledges receipt of Material Safety Data Sheets ("MSDS") applicable to Refined Fuel Products and Lubricants from Supplier and acknowledges the hazards and risks that are associated with handling and using Refined Fuel Products and Lubricants. Customer agrees that it shall read such MSDS and advise all of its employees, representatives, and agents, and all those third parties who purchase Refined Fuel Products and Lubricants from Customer of the MSDS, and of precautionary procedures for handling Refined Fuel Products and Lubricants which are set forth in such MSDS, and any supplementary MSDS or written warning which it receives from Supplier from time to time.

12.    **CREDIT CARDS.** Customer agrees that, upon receiving a request from Supplier, it will promptly execute a Merchant Agreement between Customer and CHS covering the acceptance and processing of credit cards supported by Supplier at Approved Fueling Outlets.

13.    **INDEMNIFICATION.** Customer agrees that it shall defend, indemnify, and hold harmless Country Energy, and CHS, and their directors, governors, officers, managers, agents, employees, and each of their insurers, from and against any and all claims, demands, damages, losses, liabilities, causes of action, judgments, fines, assessments (including penalties and/or interest), costs and expenses of any kind or nature, including attorneys' fees and costs and expenses of litigation and court costs (including attorneys' fees and costs and expenses of litigation and court costs incurred in enforcing this provision), without regard to amount, for damages to, or loss of property, or injury to, or death of, any person or persons, including without limitation persons employed or engaged by Customer, caused by or arising or resulting from, whether directly or indirectly, (a) Customer's operation of its business, and/or (b) Customer's breach of any of its representations, warranties, agreements, or obligations as set forth in this Agreement, and/or (c) Customer's failure to comply with any applicable federal, state or local laws, ordinances, orders, permits, rules, and regulations with regard to Customer's activities relating to the operation of its business, and in any event, regardless of whether any such damages, injuries, or death are caused by, or arise or result from, Country Energy's and/or CHS' partial and/or joint negligence; provided, however, that Customer shall not have any indemnification obligations for any such damages, injuries, or death to the extent that any such damages, injuries, or death are caused by, or arise or result from, Country Energy's and/or CHS' partial and/or joint negligence.

14.    **NOTICES.** Any notice required pursuant to this Agreement shall be in writing, and shall be deemed to be properly served on the date deposited in the U.S. Post Office if sent by certified or registered mail, or three (3) days after the date deposited in the U.S. Post Office if sent by regular mail. Such notice shall be properly addressed to the other party at its respective address set forth in the first paragraph of this Agreement, and if to Supplier, such notice shall be directed to the attention of Vice-President of Sales, Country Energy, LLC; provided that such address may be changed by proper notice delivered in accordance with the provisions of this Section. For any notice sent by mail, the party sending the notice shall also send a facsimile of such notice on the same day that the notice is deposited in the U.S. Post Office. Any notice made by a party under this Agreement by a method other than through the U.S. Postal Service shall be in writing and shall be effective only upon actual receipt of such notice.

15.    **INDEPENDENT CONTRACTOR.** This Agreement does not, and shall not be construed to, constitute Customer as an agent, legal representative, joint venturer, partner, employee, or servant of Country Energy or CHS for any purpose whatsoever.    Customer is an independent contractor and is in no way authorized to make any contract, agreement, warranty, or representation on behalf of Country Energy or CHS, or to create any obligation, express or implied, on behalf of Country Energy or CHS. At all times, Customer shall hold itself out to the public to be an independent contractor using the Marks pursuant to a license from Country Energy and/or CHS.

16.    **NO GRANTING OF TERRITORY.** Customer acknowledges and agrees that nothing in this Agreement creates or grants, or shall be construed as creating or granting, to the Customer any exclusive territory, market rights or protected area, or any exclusive group of customers. Supplier reserves the right, at its sole discretion, to sell the Products and/or other products to any customer it chooses to do business with, or to establish company-operated retail outlets selling similar or other products, as it deems appropriate, even if any such other customers or company-operated retail outlets are competitors of Customer.

17.    **ASSIGNMENT.** This Agreement may not be assigned or transferred by Customer, directly or indirectly, in full or in part, without the advance written consent of Supplier, which consent shall not be unreasonably withheld, and no attempted assignment or transfer of this Agreement by Customer shall be binding on Supplier until it has first consented in writing to such assignment. Any change of control of Customer, whether by operation of law or otherwise, shall be deemed an assignment or transfer. Assignments or transfers that have not been consented to by Supplier shall be void.

18.    **CHOICE OF LAW.** This Agreement, and all rights, obligations, and duties arising hereunder, and all disputes which may arise hereunder, shall be construed in accordance with, and governed by, laws of the State of Minnesota, without giving effect to the conflict of laws provisions thereof.

19.    **LIMITED TIME TO FILE SUIT OR ACTION.** Customer shall file any suit or action arising out of this Agreement within one (1) year from the occurrence of the facts giving rise to such suit or action, or such suit or action shall be barred.

20.    **MODIFICATION AND WAIVER.** Any of the terms and conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefit thereof; provided, however, that the failure of a party to exercise any right, power or option given it hereunder, or to insist on strict compliance with all of the terms and conditions hereof, shall not constitute a waiver of any term, condition, or right under this Agreement, unless and until that party shall have confirmed any such action or inaction to be a waiver in writing. Any such waiver shall not act as a waiver of any other term, condition, or right under this Agreement, or the same term, condition, or right on any other occasion not specifically waived in writing by such party. This Agreement may be modified, altered, or amended only by a writing signed by the party against whom the amendment is to be enforced.

7

**CHS 000057**

**21.    ENFORCEABILITY.** Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but in the event that a provision shall be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision shall be ineffective only to the extent it is explicitly deemed invalid, void or unenforceable, and the remaining provisions of this Agreement shall be valid and enforced to the fullest extent permitted by law. Upon such a determination that a provision is invalid, illegal, void, or unenforceable, the parties agree to negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible.

**22.    ENTIRE AGREEMENT.** This Agreement, inclusive of the Exhibits attached hereto and incorporated herein, contains the entire understanding between the parties hereto, and, as of the effective date set forth herein, it shall supersede all prior negotiations, representations, agreements and understandings, whether oral or written, between Supplier and/or CHS and Customer with respect to the sale and purchase of Products; provided, however, that the execution of this Agreement is not intended to, and shall not, have any

effect on the continued enforceability of any contract(s) for the sale and purchase of refined fuel products between Supplier and/or CHS and Customer, which contract(s) covers (i) specified finite quantities of refined fuel products to be sold and purchased (ii) over a specified finite period of time (iii) at a specified quantified price(s). There are not any promises, terms, conditions, or obligations other than are contained herein, and neither party shall be liable to the other party in any manner by any understandings, agreements, representations, or warranties, whether oral or written, that are not set forth herein.

**23.    HEADINGS.** The headings of Sections in this Agreement are inserted for convenience only, and shall not be deemed to constitute a part of this Agreement, or to affect interpretation of provisions hereof.

**24.    REVIEW OF AGREEMENT.** Customer hereby acknowledges that ___StuaRT     Wilson___, a representative of Country Energy, reviewed this Agreement with the authorized representative of Customer whose name is set forth below as signing this Agreement on behalf of Customer on the _21_ day of __MAY__, _2002_.

**THIS AGREEMENT SHALL NOT CONSTITUTE A BINDING CONTRACT BETWEEN THE PARTIES UNLESS AND UNTIL IT HAS BEEN EXECUTED BY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES.**

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed to be effective as of the date first above written.

**CENEX HARVEST STATES COOPERATIVES**
**By COUNTRY ENERGY, LLC, its agent**

By _____
        (Sign)
Its _____
        (Title)

FASTOP Convenience Stores Inc.
        ("CUSTOMER" - Print)

___Chris    Dickhaus___
        (Person Signing - Print)

By _____
        (Sign)
Its _____
        (Title)

EXHIBITS - REQUIRED:
A.  Quantities
B.  Petroleum Marketing Practices Act
C.  Approved Fueling Outlets

FILE NAME: Revised BMA with (CHS). doc

**CHS 000058**

8

## EXHIBIT B

### SUMMARY OF TITLE I
### OF THE PETROLEUM MARKETING PRACTICES ACT
Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

The franchise protection provisions of the Act apply to a variety of franchise arrangements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973 regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplied through a continuation of a supply agreement with your supplier, you are protected under the Act.

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal".

You should note that the Act does not restrict the reasons which may be given for the termination of a franchise agreement entered into before the June 19, 1978 effective date of the Act. However, any nonrenewal of such a terminated franchise must be based on one of the reasons for nonrenewal summarized below.

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below, under the heading "Notice Requirements for Termination or Nonrenewal".

The Act allows trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises".

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights".

This summary is intended as a single and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act itself (Pub. L.95-297,92 Stat. 322, 15 U.S.C. 2801).

### I. REASONS FOR TERMINATION

The following is a list of the only reasons for which your franchise is permitted to be terminated by the Act. One or more of these reasons must be specified if your franchise was entered into on or after June 19, 1978 and is being terminated. If your franchise was entered into before June 19, 1978, as discussed above, there is no statutory restriction on the reasons for which it may be terminated. If such a franchise is terminated, however, the Act

requires the supplier to renew the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

If your supplier attempts to terminate a franchise which you entered into on or after June 19, 1978 for a reason that is not listed under this heading, you can take the legal action against your supplier that is described below under the heading "Your Legal Rights".

*Noncompliance with franchise agreement.* Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. In order to use this reason, your supplier must have learned of this noncompliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

*Lack of Good faith efforts.* Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise for a period of 180 days before you receive the notice of termination.

*Mutual agreement to terminate the franchise.* A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of this agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

*Withdrawal from the market area.* Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. One should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted.

*Other events permitting a termination.* If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if you were given written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions t

CHS 000059

your supplier relating to trademark abuse, violation of federal or state law, or other fault or negligence;

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with federal, state, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. REASONS FOR NON-RENEWAL

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

*Failure to agree on changes or additions to franchise.* If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of preventing renewal of the franchise, your supplier may decline to renew the franchise.

*Customer complaints.* If your supplier has received numerous customer complaints relating the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

*Unsafe or unhealthful operations.* If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise. *Operation of franchise is uneconomical.* Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. NOTICE REQUIREMENTS FOR TERMINATION OR NONRENEWAL

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises as well as to all nonrenewals of franchise relationships.

*How much notice is required.* In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents. If the termination or nonrenewal is based upon a determination to withdraw from

the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

*Manner and contents of notice.* To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

    (1)    A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

    (2)    The date the termination or nonrenewal takes effect; and

    (3)    A copy of this summary.

## IV. TRIAL FRANCHISES AND INTERIM FRANCHISES

The following is a description of the special requirements that apply to trial and interim franchises.

*Trial franchises.* A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchiser and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchiser has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal".

*Interim franchises.* An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchise between the franchiser and the franchisee, does not exceed 3 years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based upon a lawful determination by the franchiser to withdraw from marketing activities in the geographic area in which the franchise operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchiser has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal".

## V. YOUR LEGAL RIGHTS

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these remedies you should read the text of the Act.

The foregoing is a true copy of the summary statement required by Section 104(d)(1) of the Petroleum Marketing Practices Act, as it appeared in the Federal Register, Vol 43, No. 169 - Wednesday, August 30, 1978.

CHS 000060

**EXHIBIT A**

Account # _515149_
City, State _Quincy, Illinois_
Energy Sales Rep _STUART Wilson_

## QUANTITIES

Date Signed: _MAY 21, 2002_

Check one: _✓_ Initial Exhibit A

Date Effective: _____

_____ Revised Exhibit A

Pursuant to paragraph 1 of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer have agreed to initially state or revise the good faith estimate of the quantities of Refined Fuel Products to be sold and purchased.

|  | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 916,667 |  | 154,000 | 1,070,667 |
| February |  |  |  |  |
| March |  |  |  |  |
| April |  |  |  |  |
| May |  |  |  |  |
| June |  |  |  |  |
| July |  |  |  |  |
| August |  |  |  |  |
| September |  |  |  |  |
| October |  |  |  |  |
| November |  |  |  |  |
| December |  |  |  |  |
| TOTAL | 11,000,000 |  | 1,848,000 | 12,848,000 |

| Supply Points | Percentage (%) of Monthly Quantities to be sold and purchased at Supply Points |
|---|---|
| Palmyra, Mo | 90% |
| Fort Madison, IA | 10% |

---

In the event this is a revised Exhibit A, select reason for signing from list below:
BUY - Buyout
RTL - Retail Location                              MRG - Merger
CES - Growth due to CES                     OTH - Other reason

---

In the event this is a revised Exhibit A, this Exhibit A supersedes any prior dated Exhibit A, and all other terms and conditions of the underlying Agreement shall remain in full force and effect.

CENEX HARVEST STATES COOPERATIVES
By COUNTRY ENERGY, L.L.C, its agent

By: _____
            (Sign)

Its: _____VP Sales_____
            (Title)

FASTOP Convenience Stores INC
                (Customer Name)

By: _____
            (Sign)

Its: _____Pres_____
            (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc
**EXHIBIT C**

**CHS 000061**

*101*

**EXHIBIT  C**

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: Fastop 101                       Account # 515149
Street Address: 301 Riverview
City/ State/Zip Code: Quincy, IL 62301     Energy Sales Rep Stuart Wilson
Type of Location (circle as appropriate):

AT = Ampride Travel Center        AC = Ampride Convenience Store        AE = Ampride Express

BF = Big Country Fueling Center   BC = Big Country Convenience Store    BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop       CC = Cenex Convenience Store          CP = Cenex Pump 24

CA = Cenex Ampride                (CF = Cenex Fueling Center)

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 40,000 | | 5,000 | 45,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 480,000 | | 60,000 | 540,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent                    Fastop Convenience Stores In
                                                    (Customer Name)
By: _____           By: _____
        (Sign)                                    (Sign)

Its: _____UP Sales_____               Its: _____
        (Title)                                   (Title)

FILE NAME:  Revised (CHS) Exhibit A and C. doc

**CHS 000062**

/03

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 103
Street Address: 732 South 36th   Account # 515149
City/ State/Zip Code: Quincy, IL 62301   Energy Sales Rep Stuart Wilson
Type of Location (circle as appropriate):

| | | |
|---|---|---|
| AT = Ampride Travel Center | AC = Ampride Convenience Store | AE = Ampride Express |
| BF = Big Country Fueling Center | BC = Big Country Convenience Store | BE = Big Country Cardtrol |
| CT = Cenex Car & Truck Stop | CC = Cenex Convenience Store | CP = Cenex Pump 24 |
| CA = Cenex Ampride | (CF = Cenex Fueling Center) | |

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 50,000 | | 5,000 | 55,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 600,000 | | 60,000 | 660,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent   FASTOP Convenience Stores, Inc.
(Customer Name)

By: _____   By: _____
(Sign)   (Sign)

Its: ___JP Sales___   Its: _____
(Title)   (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

**CHS 000063**



## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 104 8th    Account # 515149
Street Address: 235 South 8th
City/State/Zip Code: Quincy, IL 62301    Energy Sales Rep STUART Wilson
Type of Location (circle as appropriate):

| | | |
|---|---|---|
| AT = Ampride Travel Center | AC = Ampride Convenience Store | AE = Ampride Express |
| BF = Big Country Fueling Center | BC = Big Country Convenience Store | BE = Big Country Cardtrol |
| CT = Cenex Car & Truck Stop | CC = Cenex Convenience Store | CP = Cenex Pump 24 |
| CA = Cenex Ampride | (CF = Cenex Fueling Center) | |

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 40,000 | | 1,500 | 41,500 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 480,000 | | 18,000 | 498,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent                    FASTOP Convenience Stores, Inc.
                                                                    (Customer Name)

By: _____              By: _____
              (Sign)                                              (Sign)

Its: _____             Its: _____
              (Title)                                             (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000064



## EXHIBIT  C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASToP 105    Account # 515749
Street Address: Hwy 6
City/ State/Zip Code: Lewistown Mo 63452    Energy Sales Rep STUART Wilson
Type of Location (circle as appropriate):

AT = Ampride Travel Center    AC = Ampride Convenience Store    AE = Ampride Express

BF = Big Country Fueling Center    BC = Big Country Convenience Store    BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop    CC = Cenex Convenience Store    CP = Cenex Pump 24

CA = Cenex Ampride    (CF = Cenex Fueling Center)

All Other (describe)

|  | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 50,000 |  |  | 50,000 |
| February |  |  |  |  |
| March |  |  |  |  |
| April |  |  |  |  |
| May |  |  |  |  |
| June |  |  |  |  |
| July |  |  |  |  |
| August |  |  |  |  |
| September |  |  |  |  |
| October |  |  |  |  |
| November |  |  |  |  |
| December |  |  |  |  |
| TOTAL | 600,000 |  |  | 600,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent                FASToP Convenience Stores, Inc.
                                                                (Customer Name)

By: _____            By: _____
          (Sign)                                              (Sign)

Its: _____JP Sato_____            Its: _____
          (Title)                                            (Title)

FILE NAME:  Revised (CHS) Exhibit A and C. doc

CHS 000065

10⁷

**EXHIBIT C**

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 107                                    Account # 515149
Street Address: 160 West Collins
City/ State/Zip Code: Menlin, IL 62951       Energy Sales Rep STUART Wilson
Type of Location (circle as appropriate):

AT = Ampride Travel Center        AC = Ampride Convenience Store        AE = Ampride Express

BF = Big Country Fueling Center   BC = Big Country Convenience Store   BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop       CC = Cenex Convenience Store          CP = Cenex Pump 24

CA = Cenex Ampride                (CF = Cenex Fueling Center)

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 50,000 | | 3,000 | 53,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 600,000 | | 36,000 | 636,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent                    FASTOP Convenience Stores, Inc.
                                                                      (Customer Name)
By: _____                              By: _____ on behd
        (Sign)                                              (Sign)

Its: ____JP Sale____                               Its: __heul__
        (Title)                                            (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000066



*108*

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 108    Account # 515149
Street Address: 1600 North 24th
City/ State/Zip Code: Quincy, IL 6230    Energy Sales Rep STUART WILSON
Type of Location (circle as appropriate):

AT = Ampride Travel Center    AC = Ampride Convenience Store    AE = Ampride Express

BF = Big Country Fueling Center    BC = Big Country Convenience Store    BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop    CC = Cenex Convenience Store    CP = Cenex Pump 24

CA = Cenex Ampride    (CF = Cenex Fueling Center)

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 40,000 | | 1,000 | 41,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 480,000 | | 12,000 | 492,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____ (Sign)

Its: VP Sales (Title)

FASTOP Convenience Stores, In
(Customer Name)

By: _____ (Sign)

Its: _____ (Title)

FILE NAME:  Revised (CHS) Exhibit A and C. doc

CHS 000067

*109*

EXHIBIT C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 109                           Account # 515149
Street Address: 104 South Warsaw
City/State/Zip Code: Ursa, IL 62376        Energy Sales Rep STUART Wilson
Type of Location (circle as appropriate):

AT = Ampride Travel Center          AC = Ampride Convenience Store      AE = Ampride Express

BF = Big Country Fueling Center     BC = Big Country Convenience Store  BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop         CC = Cenex Convenience Store        CP = Cenex Pump 24

CA = Cenex Ampride                  (CF = Cenex Fueling Center)

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 100,000 | | 10,000 | 70,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 120,000 | | 120,000 | 840,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent                FASTOP Convenience Stores, In
                                                (Customer Name)
By: _____                     By: _____
          (Sign)                                          (Sign)

Its: _____VP Sales_____                     Its: _____
          (Title)                                         (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000068

*110*

### EXHIBIT C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 110                          Account # 515149
Street Address: 1002 Maine
City/ State/Zip Code: Warsaw, IL 62379    Energy Sales Rep STUART Wilson

Type of Location (circle as appropriate):

AT = Ampride Travel Center            AC = Ampride Convenience Store      AE = Ampride Express

BF = Big Country Fueling Center       BC = Big Country Convenience Store  BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop           CC = Cenex Convenience Store        CP = Cenex Pump 24

CA = Cenex Ampride                    (CF = Cenex Fueling Center)

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 35,000 | | 2,000 | 37,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 420,000 | | 24,000 | 444,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____       By: FASTOP Convenience Stores, Inc
        (Sign)                            (Customer Name)

Its:    VP Sales                  Its: _____
        (Title)                           (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000069

*III*

## EXHIBIT C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: ~~FASTOP~~
Street Address: 704 Lake Ave.
City/ State/Zip Code: Wayland MO 63472   Account # 515149   Energy Sales Rep STUART Wilson

Type of Location (circle as appropriate):

AT = Ampride Travel Center          AC = Ampride Convenience Store       AE = Ampride Express

BF = Big Country Fueling Center      BC = Big Country Convenience Store   BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop         CC = Cenex Convenience Store         CP = Cenex Pump 24

CA = Cenex Ampride                  (CF = Cenex Fueling Center)

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 50,000 | | 4,000 | 54,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 600,000 | | 48,000 | 648,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____ (Sign)

Its: _____ (Title)

FASTOP Convenience Stores, Inc
(Customer Name)

By: _____ (Sign)

Its: _____ (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

*12*

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: *FASTOP 112*    Account # *515149*
Street Address: *105 S. Warrel St.*
City/State/Zip Code: *Bowen, IL  62316*    Energy Sales Rep *STUART Wilson*
Type of Location (circle as appropriate):

AT = Ampride Travel Center    AC = Ampride Convenience Store    AE = Ampride Express

BF = Big Country Fueling Center    BC = Big Country Convenience Store    BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop    CC = Cenex Convenience Store    CP = Cenex Pump 24

CA = Cenex Ampride    (CF = Cenex Fueling Center)

All Other (describe)_____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 55,000 | | 5,000 | 60,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 660,000 | | 60,000 | 720,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____ (Sign)

Its: *JPSdols* (Title)

*FASTOP Convenience Stores, Inc*
(Customer Name)

By: _____ (Sign)

Its: *Prell* (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

**CHS 000071**

113

## EXHIBIT C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: _FASTOP #113_                                Account # _515149_
Street Address: _2 Tyler Drive_
City/ State/Zip Code: _Liberty, IL 62347_          Energy Sales Rep _STUART WILSON_
Type of Location (circle as appropriate)

| AT = Ampride Travel Center | AC = Ampride Convenience Store | AE = Ampride Express |
| BF = Big Country Fueling Center | BC = Big Country Convenience Store | BE = Big Country Cardtrol |
| CT = Cenex Car & Truck Stop | CC = Cenex Convenience Store | CP = Cenex Pump 24 |
| CA = Cenex Ampride | (CF = Cenex Fueling Center) | |

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 50,000 | | 7,500 | 57,500 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 600,000 | | 90,000 | 690,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent          _FASTOP Convenience Store, Inc_
                                           (Customer Name)

By: _____          By: _____
         (Sign)                                 (Sign)

Its: _VP Sales_                       Its: _Pres_
         (Title)                                (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000072

*115*

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

| | |
|---|---|
| Name: FASTOP 115 | Account # 515149 |
| Street Address: 504 Union St. | |
| City/State/Zip Code: Hannibal, Mo 63451 | Energy Sales Rep STUART Wilson |

Type of Location (circle as appropriate):

AT = Ampride Travel Center     AC = Ampride Convenience Store     AE = Ampride Express

BF = Big Country Fueling Center     BC = Big Country Convenience Store     BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop     CC = Cenex Convenience Store     CP = Cenex Pump 24

CA = Cenex Ampride     (CF = Cenex Fueling Center)

All Other (describe)

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 30,000 | | | 30,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 360,000 | | | 3,600,000 |

| CENEX HARVEST STATES | |
|---|---|
| By COUNTRY ENERGY, LLC its agent | FASTOP Convenience Stores, Inc. |
| | (Customer Name) |
| By: _____ | By: _____ |
| (Sign) | (Sign) |
| Its: JP Sale | Its: President |
| (Title) | (Title) |

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000073


114

EXHIBIT  C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: _FAStoP 116_    Account # _515149_
Street Address: _Corner Hwy 99 & Chestnut_
City/ State/Zip Code: _VerSalles, IL  62379_    Energy Sales Rep _STUART Wilson_
Type of Location (circle as appropriate):

AT = Ampride Travel Center          AC = Ampride Convenience Store          AE = Ampride Express

BF = Big Country Fueling Center     BC = Big Country Convenience Store      BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop         CC = Cenex Convenience Store            CP = Cenex Pump 24

CA = Cenex Ampride                  (CF = Cenex Fueling Center)

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 100,000 | | 5,500 | 65,500 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 720,000 | | 66,000 | 786,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _[signature]_               By: _[signature]_
        (Sign)                          (Sign)

                                FAStoP Convenience Stores, In
                                        (Customer Name)

Its: _VP Sales_                 Its: _PresDell_
        (Title)                         (Title)

FILE NAME:  Revised (CHS) Exhibit A and C. doc

CHS 000074

## EXHIBIT C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: _FAStoP #117_     Account # _515149_
Street Address: _500 Buchanan St._
City/ State/Zip Code: _Carthage, IL 62321_     Energy Sales Rep _STUART WILSON_
Type of Location (circle as appropriate):

AT = Ampride Travel Center     AC = Ampride Convenience Store     AE = Ampride Express

BF = Big Country Fueling Center     BC = Big Country Convenience Store     BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop     CC = Cenex Convenience Store     CP = Cenex Pump 24

CA = Cenex Ampride     (CF = Cenex Fueling Center)

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 40,000 | | 4,000 | 44,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 480,000 | | 48,000 | 528,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____(Sign)_____

Its: _UP Sales_ (Title)

_FAStoP Convenience Stores, Inc_
(Customer Name)

By: _____(Sign)_____

Its: _____ (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000075

118

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FAStoP 118
Street Address: 130 E. Mechanic St.    Account # 515149
City/ State/Zip Code: New Canton, IL 62356    Energy Sales Rep STUART Wilson
Type of Location (circle as appropriate):

| | | |
|---|---|---|
| AT = Ampride Travel Center | AC = Ampride Convenience Store | AE = Ampride Express |
| BF = Big Country Fueling Center | BC = Big Country Convenience Store | BE = Big Country Cardtrol |
| CT = Cenex Car & Truck Stop | CC = Cenex Convenience Store | CP = Cenex Pump 24 |
| CA = Cenex Ampride | CF = Cenex Fueling Center | |

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 20,000 | | 500 | 20,500 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 240,000 | | 6,000 | 246,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____ (Sign)

Its: _____ (Title)

FAStoP Convenience Stores, Jn
Customer Name

By: _____ (Sign)

Its: _____ (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000076

## EXHIBIT C

## APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 119                                    Account # 615149
Street Address: Route 11, Box 11
City/State/Zip Code: Alexandria, MO 63430 Energy Sales Rep STUART Wilson

Type of Location (circle as appropriate):

AT = Ampride Travel Center          AC = Ampride Convenience Store      AE = Ampride Express

BF = Big Country Fueling Center     BC = Big Country Convenience Store  BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop         CC = Cenex Convenience Store        CP = Cenex Pump 24

CA = Cenex Ampride                  (CF = Cenex Fueling Center)

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 95,000 | | 100,000 | 195,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 1,140,000 | | 1,200,000 | 2,340,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____ (Sign)

Its: VP Sales (Title)

FASTOP Convenience Stores, Inc.
(Customer Name)

By: _____ (Sign)

Its: _____ (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000077

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 100     Account # 515749
Street Address: 823 North 12th
City/ State/Zip Code: Quincy IL 62361     Energy Sales Rep STUART Wilson

Type of Location (circle as appropriate):

AT = Ampride Travel Center     AC = Ampride Convenience Store     AE = Ampride Express

BF = Big Country Fueling Center     BC = Big Country Convenience Store     BE = Big Country Cardtrol

CT = Cenex Car & Truck Stop     CC = Cenex Convenience Store     CP = Cenex Pump 24

CA = Cenex Ampride     CF = Cenex Fueling Center

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 121,667 | | | 121,667 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 1,460,000 | | | 1,460,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____
              (Sign)

Its: _____
              (Title)

By: _____
              (Sign)

Its: _____
              (Title)

FASTOP Convenience Stores, In
(Customer Name)

FILE NAME: Revised (CHS) Exhibit A and C. doc

CHS 000078

*10⁴*

## EXHIBIT C

### APPROVED FUELING OUTLET

Pursuant to paragraph 4(a) of the Branded Refined Fuels and Lubricants Master Marketing Agreement, Supplier and Customer agree that the estimated annual branded gallons listed below are for the Customer's Approved Fueling Outlet as shown below.

Name: FASTOP 1016     Account # 515149
Street Address: 923 North 12th
City/ State/Zip Code: Quincy, IL 62301   Energy Sales Rep Stuart Wilson
Type of Location (circle as appropriate)

| | | |
|---|---|---|
| AT = Ampride Travel Center | AC = Ampride Convenience Store | AE = Ampride Express |
| BF = Big Country Fueling Center | BC = Big Country Convenience Store | BE = Big Country Cardtrol |
| CT = Cenex Car & Truck Stop | CC = Cenex Convenience Store | CP = Cenex Pump 24 |
| CA = Cenex Ampride | (CF = Cenex Fueling Center) | |

All Other (describe) _____

| | Gasoline | Premium Diesel | Other Distillates | Total Refined Fuels |
|---|---|---|---|---|
| January | 30,000 | | | 30,000 |
| February | | | | |
| March | | | | |
| April | | | | |
| May | | | | |
| June | | | | |
| July | | | | |
| August | | | | |
| September | | | | |
| October | | | | |
| November | | | | |
| December | | | | |
| TOTAL | 3600,000 | | | 3600,000 |

CENEX HARVEST STATES
By COUNTRY ENERGY, LLC its agent

By: _____ (Sign)

Its: _____ VP Sales _____ (Title)

FASTOP Convenience Stores, Inc
(Customer Name)

By: _____ (Sign)

Its: _____ (Title)

FILE NAME: Revised (CHS) Exhibit A and C. doc