E-FILED
Tuesday, 18 January, 2005  05:43:39 PM
Clerk, U.S. District Court, ILCD

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

AMOCO OIL COMPANY, now know as )
BP PRODUCTS NORTH AMERICA INC., )    Case No. 2:02CV00765 DS

       Plaintiff,       )

  vs.                            )    MEMORANDUM OPINION
                              AND ORDER
PREMIUM OIL COMPANY,             )
et al.,
       Defendants.      )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. INTRODUCTION

Pending before the court are cross-motions for partial summary judgement.[1] This dispute arises out of the alleged breach of several contracts between the parties. Pursuant to Branded Jobber Contracts ("Jobber Contracts"), Defendant Premium Oil Company ("Premium") purchased petroleum products from Plaintiff Amoco Oil

---

[1]The court, having reviewed the briefing submitted by the parties will rule on the motions without the assistance of oral argument, pursuant to DUCivR 7-1(f).


Exhibit
90

Company ("Amoco"), now known as BP Products North America, Inc. (sometimes "BP" or "BP Amoco").[2]

The Jobber Contracts provided that any extension of credit by Amoco to Premium would be subject to the execution of an "unlimited personal guaranty". On or about February 13, 1995, Paul S. Callister ("Callister") executed and delivered to Amoco an Unlimited Guaranty. That Unlimited Guaranty is signed "Premium Oil Co By: Paul S. Callister President". See Pl.['s] Mem. Supp. at Ex. 5. On or about January 13, 1998, Callister executed and delivered to Amoco an identical Unlimited Guaranty signed "Premium Oil Co Paul Callister, President". See id. at Ex 10.

Premium and/or its sister company, Premoco,[3] (unless otherwise noted, collectively "Premium"), also entered into three Jobber Outlet Incentive Contracts ("Incentive Contracts") with Amoco in

---

[2] On or about February 13, 1995, Amoco and Premium entered into a Jobber Contract for the period of February 13, 1995 to December 31, 1997. See Pl.['s] Mem. Supp. at Ex. 2. On or about December 1, 1997, Amoco and Premium entered into a new Jobber Contract for the period of January 1, 1998 to December 31, 2000. See id. at Ex. 9. After the expiration of the latter Jobber Contract, Premium continued to operate under its terms and the contract purportedly was unilaterally extended by Amoco for the period of January 1, 2001 through March 31, 2002.

[3] It is undisputed that Premoco and Premium are sister companies and that Premium operated under Premium's Jobber Contracts.

2

which Amoco agreed to pay incentive money to Premium to modernize its Vernal, Lehi and Cedar City, Utah, Amoco branded service stations.[4] The terms of the Incentive Contracts provide that if the jobber, either Premium or Premoco, "for any reason", ceases being an exclusively Amoco-branded facility prior to the end of the 10 year term of the contract, the jobber must reimburse Amoco a pro-rated amount based on the length of time that the station was exclusively an Amoco-branded facility.

Amoco merged with BP on December 31, 1998. On November 15, 2000, BP Amoco announced its intention to sell its Salt Lake City Refinery and related terminal and pipeline assets. That sale did not include the branded marketing operations such as the retail stations supplied by the Salt Lake refinery. BP Amoco by letter dated November 15, 2000, informed its jobbers, including Premium, that it was "well satisfied with our marketing operations and plan to grow our branded business as previously announced in these market areas." Defs.['] Mem. Opp'n at Ex. K. The letter further stated that "supply agreements will need to be negotiated with the

---

[4] On May 22, 1996, Premoco and Amoco entered in an Incentive Contract with respect to the Vernal service station. See Pl.['s] Mem. Supp. at Ex. 6. On July 15, 1996, Premium and Amoco entered into an Incentive Contract with respect to the service station at Lehi. See id. at Ex. 7. On November 1. 1996, Premium and Amoco entered into an Incentive Contract with respect to the Cedar City service station. See id. at Ex. 8.

buyers of the refineries, other refiners or alternative sources. We do not anticipate any problems in securing such agreements, since we move large volumes and will be a key customer for future refinery owners." Id. In January of 2000, BP Amoco explained to its Jobbers that Amoco branded stations within the Salt Lake Business Unit would be branded BP. Amoco fuels, however, would continue to be sold at those stations, and the re-branding would include updating the stations with new "Amoco fuels" labels.

It is undisputed that by May 31, 2001, Premium had made the decision to de-brand its three Amoco stations and re-brand them to reflect affiliation with Sinclair Oil. On June 22, 2001, Premium signed an agreement with Sinclair Oil to re-brand its three Amoco stations with brands of Sinclair Oil. On July 17, 2001, the sale of BP Amoco's retail marketing assets to Tesoro Petroleum Corporation was announced. On or about July 9, 2001, Premium de-branded its Cedar City Amoco station. On or about August 9, 2001, Premium de-branded its Lehi Amoco station. On or about August 17, 2001, Premoco de-branded its Vernal Amoco station.

Amoco claims that Premium owes it $190,062.29, which it states represents a pro-rated dollar amount based on the unperformed balance of the Incentive Contracts. Premium, on the other hand,

4

claims that it de-branded its Amoco stations, and re-branded them Sinclair Oil, only after Amoco's anticipatory breach of those contracts by manifesting a positive and unequivocal intent to vacate the Utah Market.

## II. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56, summary judgment is proper only when the pleadings, affidavits, depositions or admissions establish there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.[5] E.g., Celotex Corp. v. Catrett, 477 U.S. 317 (1986). This burden has two distinct components: an initial burden of production on the moving party, which burden when satisfied shifts to the nonmoving party, and an ultimate burden of persuasion, which always remains on the moving party. See 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2727 (2d ed. 1983).

---

[5] Whether a fact is material is determined by looking to relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

5

When summary judgment is sought, the movant bears the initial responsibility of informing the court of the basis for his motion and identifying those portions of the record and affidavits, if any, it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. In a case where a party moves for summary judgment on an issue on which it would not bear the burden of persuasion at trial, its initial burden of production may be satisfied by showing the court there is an absence of evidence in the record to support the nonmovant's case.[6] Id., 477 U.S. at 323. "[T]here can be no issue as to any material fact . . .

---

[6] In his dissent in Celotex, Justice Brennan discussed the mechanics for discharging the initial burden of production when the moving party seeks summary judgment on the ground the nonmoving party--who will bear the burden of persuasion at trial--has no evidence:

> Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

477 U.S. at 323 (citations omitted).

6

. [when] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.

> If the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . .

Liberty Lobby, 477 U.S. at 252. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. Id., 477 U.S. 242.

7

## III. DISCUSSION

A. Breach of Contract (Counts I, II and III).

Counts I, II, and III of Plaintiff's Second Amended Complaint allege breach of the Incentive Contracts relating to Premium's three Amoco branded stations. BP Amoco contends that it is entitled to summary judgment in the amount of $190,062.29 because there is no genuine issue of material fact as to those claims. Specifically BP Amoco asserts that it is undisputed that the parties entered into three Incentive Contracts by which Amoco provided Premium with $347,725.75 in incentive payments to modernize three retail service stations. It is also undisputed that prior to the expiration of those Incentive Contracts, Premium de-branded its three Amoco-branded stations and re-branded them Sinclair. Premium counters that it is entitled to summary judgment on BP Amoco's claims because it de-branded its three Amoco Stations only after BP Amoco repudiated the Incentive Contracts by manifesting a positive and unequivocal intent to vacate the Utah market.

### 1. Contract Performance.

Amoco first urges that it fully performed under the three Incentive Contracts. Moreover, it contends that because it fully performed under the three Incentive Contracts, it cannot be found to have manifest an intent not to perform those contracts.

It is undisputed that Amoco performed under each of the Incentive Contracts by providing $347,725.75 in incentive payments to Premium. In consideration for those incentive payments, Premium, among other things, agreed to the following provision found in each of the Incentive Contracts.

> 6. Jobber agrees to comply with Amoco's image programs and standards at Jobber's Retail Outlet for an uninterrupted period of 10 years beginning upon Jobber's receipt of the first JOIP payment for said Retail Outlet. <u>If said Retail Outlet, for any reason,</u> including but not limited to Jobber's loss of the right to lease any facility now owned by Jobber, <u>ceases being an exclusively Amoco-branded facility and/or ceases to conform to Amoco's image programs and standards for any time period prior to the end of said period, Jobber shall reimburse Amoco within 30 days of Amoco's demand, a pro-rated amount based on the length of time said Retail Outlet was exclusively an Amoco-branded facility</u> meeting Amoco's image programs and standards (for example, if the Retail Outlet was exclusively Amoco-branded and met Amoco's image programs and standards for five years, Jobber would reimburse Amoco 50% of the JOIP incentive money paid to Jobber).

Pl.['s] Mem. Supp. at Ex. 6 (emphasis added). Premium's de-branding of its three Amoco service stations, on its face, appears

9

to the court to be a breach of paragraph 6 of the Incentive Contracts.

Premium, however, urges that when the Incentive Contracts are construed and harmonized with the Jobber Contracts it was justified in finding a new supplier and re-branding its stations because it learned that Amoco would be pulling out of Utah. The court disagrees. The two Jobber Contracts at issue, in relevant part, provide as follows:

> 2. Products and Quantities (Schedule A). Amoco agrees to sell and Jobber agrees to purchase and receive Amoco's currently offered and available branded petroleum products ("Products"), as determined and designated by Amoco in its sole discretion and as more fully and specifically set forth in Schedule A. ... Jobber agrees to purchase the Products subject to the respective minimum and maximum quantities set forth in Schedule A, as amended from time to time.

Pl.['s] Mem. Supp. at Ex. 2. The Jobber Contracts further provide:

> 23. Discontinuance of Product or services. <u>Amoco, at its sole option</u>, at any time <u>may</u>: (a) <u>discontinue the production or sale of any Product covered hereby</u>; (b) change the specifications of any such Product; (c) replace any such Product with another Product; (d) <u>change or withdraw the trademark applicable to any such Product</u>; (e) change or withdraw services offered in connection with any such Product, including but not limited to, credit card privileges ; and/or (f) <u>withdraw from marketing any such Product in the geographic area encompassing Jobber's Schedule B area</u> and/or in which Jobber's bulk plants or any of Jobber's Assigned Terminal(s) are located. Amoco shall not be liable to

10

>     Jobber by reason of any such discontinuance, replacement,
>     change or withdrawal.

(Id.)(emphasis added). As Amoco notes, by signing the Jobber Contracts, Premium agreed that Amoco had the right to discontinue the production or sale of its product, to change or withdraw its trademark, and to withdraw marketing its petroleum products altogether. The Incentive Contracts do not impose upon Amoco an obligation to continue to provide Premium with Amoco branded petroleum products and/or with permission to use or display Amoco's trademarks.

Because Premium de-branded its Vernal, Lehi and Cedar City stations, those facilities ceased being exclusively Amoco branded facilities, "for any reason", prior to the end of the 10 year contract term. Premium, therefore, has breached the Incentive Contracts and BP Amoco is entitled to a prorated amount of the incentive payments based on the unperformed balance of the contracts.

### 2. Anticipatory Repudiation

Even if Amoco has not completely performed under the Incentive Contracts, the court agrees with BP Amoco that the evidence

11

presented by Premium is insufficient to establish anticipatory repudiation. "An anticipatory breach occurs when a party to an executory contract manifests a positive and unequivocal intent not to render performance when the time fixed for performance is due." Kasco Services Corp. v. Benson, 831 P.2d 86, 89 (Utah 1992). Because Premium asserts anticipatory breach as an affirmative defense, it bears the burden of proof. See e.g. Messick v. PHD Trucking Serv., Inc., 615 P.2d 1276, 1277 (1980)("[a]ccord and satisfaction is an affirmative defense and requires the party alleging it to meet the burden of proof as to every necessary element").

In analyzing Premium's allegations of repudiation, the court is guided by the following legal standards.

> A repudiation occurs when a party to a contract makes "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Uniform Commercial Code § 2-610 cmt. 1 (1989). "[T]o constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not perform." Scott v. Majors, 980 P.2d 214, 218 (Utah Ct. App. 1999) (quotation marks and alterations omitted). See also Utah Code Ann. § 70A-2-610. "Mere expression of doubt as to [a party's] willingness or ability to perform is not enough to constitute a repudiation." Restatement (Second) of Contracts § 250 cmt. b (1979). Anticipatory repudiation requires more than statements revealing a party does not want to perform the contract or has misgivings about the

12

contract. Hurwitz v. David K. Richards & Co., 20 Utah 2d 232, 436 P.2d 794, 795-96 (1968).

Lantec Inc. v. Novell, Inc., 306 F.3d 1003, 1014-1015 (10th Cir 2002).

Premium cites the following justifications for de-branding its Amoco stations in anticipation of Amoco breaching its contracts.

> First, after the merger, Premium learned it would have had to re-brand its stations to BP. This brand had no value in the Utah market and would cost Premium lost gallons sold unless BP Amoco could build its brand recognition to similar levels Amoco enjoyed prior to the Merger. ...
>
> Second, after attending the January, 2000 BP Amoco marketing meeting, Premium recognized that BP Amoco would not want the Premium stations because Premium could not meet the new escalating annual overall jobbership minimum gallons sold requirement ... or the new monthly minimum gallons sold per site. ...
>
> Third, Plaintiff was reducing co-op advertizing. This was particularly harmful because Premium would be forced to re-brand to an unknown brand -BP- that had virtually no brand recognition in Utah with less advertizing. ...
>
> Additionally, after the November 15, 2000 announcement of BP Amoco to sell its Salt Lake Refinery, Premium recognized that BP Amoco would not stay in the market because it no longer had its own refinery to supply its branded motor fuel. Premium also recognized that it would have difficulty purchasing fuel to sell at its stations. ...

Defs.['] Mem. Supp. at pp. 11-13.

For purposes of the present motions the court agrees with BP Amoco that the foregoing assertions are immaterial because they do not provide evidence that BP Amoco would be "pulling out of the Utah market", as alleged by Premium, or that BP Amoco manifested a positive and unequivocal intent to vacate the Utah market, before Premium decided to de-brand its three Amoco stations and re-brand them Sinclair Oil. The record before the court reflects that Premium made the decision to de-brand its Amoco stations, and to contract with Sinclair Oil Company to re-brand those stations Sinclair, before any public announcement that BP Amoco was selling its Utah market. More importantly, Premium points to no specific provision of the Incentive Contracts, or any other contracts, that Amoco manifest an intent not to perform. In short, Premium has failed in its burden of proof on the issue of anticipatory repudiation and its motion for partial summary judgment must be denied.

B.  **Personal Liability of Paul Callister (Count V).**

Count V of Plaintiff's Second Amended Complaint is plead in the alternative to Count IV and seeks declaratory judgment that Callister is personally liable under the Unlimited Guaranties for the debt of Premium. Count IV seeks declaratory judgment that

14

Premium is liable under the Unlimited Guaranties. By its present motion, Amoco seeks summary judgment on Count V, or in the alternative, summary judgment on Count IV.

As noted previously, on February 13, 1995, in accordance with the terms of the Jobber Contract of the same date[7], Callister executed an Unlimited Guaranty in favor of Amoco to induce Amoco "to lend money or otherwise extend financial accommodation to or for the account of Premium". Pl.['s] Mem. Supp. at Ex. 5. That Unlimited Guaranty is signed as follows:

> Premium Oil Co
> By: Paul S. Callister
>         President

Id. Below the signature block, the Guaranty provides:

> Note: When executed by a corporation, the corporate seal should be affixed and there should be attached to the guaranty a certified copy of the resolution of the Board of Directors authorizing the signing office to execute

---

[7]Each of the Jobber Contracts entered into by Premium and Amoco contained the following provision:

> 4.  Payment Terms.
> (a) Credit. Nothing in this Contract shall be construed as obligating Amoco to extend credit to Jobber. In the event Amoco does extend credit to Jobber, such extension of credit shall be subject to the following requirements, including but not limited to paying for all Product purchases by electronic funds transfer ("EFT"); submitting an annual financial statement; <u>and executing an unlimited personal guaranty.</u>

Pl.['s] Mem. Supp. at Ex. 2 (emphasis added).

15

and deliver the guaranty in the name and on behalf of the corporation.

Id. The Guaranty neither has Premium's corporate seal attached, nor is there attached the required board resolution. On January 13, 1998, Callister executed an identical guaranty as follows:

> Premium Oil Co
> Paul S. Callister, President

Id. at Ex. 10. The required corporate seal and resolution are similarly absent. See id.

Amoco by the terms of the Incentive Contracts agreed to pay Premium certain incentives to modernize three retail stations, subject to Premium's promise to reimburse Amoco under certain conditions. Those contractual conditions have come to pass resulting in Premium's indebtedness to BP Amoco. The terms of the Unlimited Guaranties, therefore, may be invoked.

The issue, therefore, is whether pursuant to the terms of the Unlimited Guaranties, Defendant Callister is personally liable for Premium's indebtedness to Amoco. Utah has adopted the doctrine known as descripto personae, which appears to the court to address the matter.

> This term is defined as "the use of a word or phrase merely to identify or point out the person intended and not as an intimation that the language in connection with

16

which it occurs is to apply to him only in the technical character which might appear to be indicated by the word." Dann v. Team Bank, 788 S.W. 2d 182, 184 (Tex. App. 1990). See also Sebastian Int'l, Inc. v. Peck, 195 Cal. App. 3d 803, 240 Cal. Rptr. 911, 913 (1987) ("'"Where a writing in the nature of a contract is signed by a person, and contains apt words to bind him personally, the fact that to such signature is added such words as 'trustee,' 'agent,' 'treasurer,' 'president,' and the like does not change the character of the person so signing, but is considered as merely descriptive of him."'") (quoting Ricker v. B-W Acceptance Corp., 349 F.2d 892, 894 (10th Cir. 1965) (quoting Ellis v. Stone, 21 N.M. 730, 158 P. 480, 483 (1916))); Klutts Resort Realty, Inc. v. Down'Round Dev. Corp., 268 S.C. 80, 232 S.E. 2d 20, 24 (1977) (defining "descriptio personae" as "a term descriptive of the person rather that the relationship in which he signs the agreement"); 14 Richard R. Powell, Powell on Real Property § 81A.04[1][1][iv][E], at 81A-42 (Michael Allan Wolf ed., 2002) (describing "descriptio personae" as "[c]ertain terms sometimes added to a person's name [that] are merely descriptive matter intended to clarify the identity of the person, but ... their use or non-use should generally play no part in the validity of the conveyance").

The Utah Supreme Court validated the descriptio personae concept for Utah courts in Boise Cascade Corp. v. Stonewood Development Corp., 655 P.2d 668 (Utah 1982). In that case, a Stonewood corporate officer who had signed a loan guaranty agreement as "Vice President" sought to absolve himself of personal liability on the guaranty agreement. He claimed that since he had written the words "Vice President" next to his signature on the agreement, his signature was in a representative capacity and bound only the corporation and not him personally. The trial court disagreed and granted summary judgment to the creditor, and the Utah Supreme Court affirmed.

TWN, Inc. v. Michel, 66 P. 3d 1031,1033 (Utah App. 2003). In Boise Cascade, the Utah Supreme Court reasoned that "[t]he 'V-Pres.'

17

following appellant's signature on the agreement is a matter of description (descriptio personae), not of capacity to bind a different principal obligor; otherwise the liability would result in an absurdity, i.e., that the principal obligor also was the guarantor of his own obligation." Boise Cascade, 655 P.2d at 669 (Utah 1982).

The court concludes that by the terms of the Unlimited Guaranties, Callister, as an inducement for Amoco to lend money or extend credit to Premium, unconditionally guaranteed payment to Amoco when due. The Unlimited Guaranties clearly make a distinction between the "Debtor" and the "Undersigned" which indicates that Amoco was not accepting a guaranty from Premium, defined in the Unlimited Guaranties as the "Debtor". This conclusion is further substantiated by Premium's and Callister's failure to have affixed to the contract Premium's corporate seal, or to attach a resolution of Premium's Board of Directors as required when the Unlimited Guaranties are signed on behalf of a corporation. Any other interpretation, as reasoned by the Utah Supreme Court in Bosie Cascade, would result in the absurd situation where the principal obligor was also the guarantor of the obligation. See Ricker v. B-W Acceptance Corp., 349 F.2d 892, 895 (10th Cir. 1965) (finding that guaranty's language that the

18

"undersigned" had guaranteed any and all indebtedness of the debtor furniture company manifested an intent to bind the company president personally and that the company guaranteeing its own debt "would add nothing to its existing obligation" and "would serve no purpose").

### IV. CONCLUSION

For the reasons stated, Plaintiff's Motion for Partial Summary Judgment is **GRANTED**, and Defendants' Motion for Partial Summary Judgment is **DENIED**.

**IT IS THEREFORE ORDERED** that Plaintiff is granted judgment on Counts I, II, III and V of the second amended complaint.

DATED this 26th day of February, 2004.

BY THE COURT:

_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

19

```
                                                              asp
                    United States District Court
                              for the
                         District of Utah
                        February 27, 2004
```

* * CERTIFICATE OF SERVICE OF CLERK * *

Re:  2:02-cv-00765

True and correct copies of the attached were either mailed, faxed or e-mailed by the clerk to the following:

    Mr. Douglas J Parry, Esq.
    PARRY ANDERSON & GARDINER
    60 E SOUTH TEMPLE STE 1200
    SALT LAKE CITY, UT  84111
    EMAIL

    Mr. John A. Adams, Esq.
    RAY QUINNEY & NEBEKER
    36 S STATE ST STE 1400
    PO BOX 45385
    SALT LAKE CITY, UT  84145-0385
    EMAIL

    Dawn M. Johnson, Esq.
    GREENSFELDER HEMKER & GALE PC
    10 S BROADWAY STE 2000
    ST LOUIS, MO  63102-1774
    EMAIL