**E-FILED**
Friday, 28 January, 2005  09:13:20 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CHS INC., formerly known as CENEX ) | | |
| HARVEST STATES COOPERATIVE, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v.                                 ) | No.  03-3263-CV | |
| ) | | |
| CHRISTOPHER BICKHAUS,               ) | | |
| ) | | |
| Defendant.                         ) | | |

### ORDER

RICHARD MILLS, U.S. District Judge:

The Court now considers Plaintiff CHS Inc.'s Motion for Summary Judgment.

### FACTS

Defendant Christopher Bickhaus was the President and owner of Fastop, Inc. ("Fastop"), a company which owned and operated convenience stores in Missouri and Illinois.  Fastop was a retailer of gasoline and diesel fuel.

On May 21, 2002, Plaintiff CHS Inc. ("CHS") agreed to sell to

1

Fastop gasoline, diesel fuel, and automotive oils[1].  On June 14, 2002,

pursuant to the terms of a Participation Agreement, CHS advanced

Fastop $275,000.00 in First Year Incentive Money.  The money was an

estimate of incentive money CHS would owe to Fastop, calculated as an

amount equal to $0.025 per gallon multiplied by Fastop's estimate of the

11,000,000 gallons of fuel it would purchase from CHS in the first year.

   As part of the agreement, Fastop executed a Promissory Note in

which it agreed to pay CHS $70,500.00, together with interest on the

unpaid principal amount at the rate of 6% per year.  Fastop was to pay

the principal and interest accruing on the unpaid principal beginning on

July 15, 2002, at a rate of $.0075 per gallon added to all purchases of

refined fuel products by Fastop from CHS.  The entire remaining balance

on the June 14, 2002, Note (hereinafter "the June Note"), including

accrued interest, was due and payable in full on or before July 15, 2003.

Pursuant to the Participation Agreement, Fastop understood that "if 1st

year volumes are not met, [CHS] will have the option to bill back a

portion of any up-front image funds provided."  See Ex. 1, Cummings

---

[1] At the time of the agreement, Plaintiff CHS was known as Cenex Harvest States
Cooperatives.  The company later changed its name to CHS.

Declar. at ¶ 13 and Ex. H.

CHS had concerns about Bickhaus's financial situation.  So, on October 30, 2002, Bickhaus signed a Guaranty in order to continue receiving fuel from CHS.  Bickhaus claims he signed the Guaranty in the presence of CHS representative Stuart Wilson and that he told Wilson he was not signing the Guaranty in his personal capacity.  Bickhaus claims he also told CHS representative Scott Beiswenger that he would not personally guarantee any of Fastop's debts.

Bickhaus signed the Guaranty "Chris Bickhaus, as President of Fastop."  The Guaranty bound the signatory to pay CHS, with interest and without deduction for any claim of set-off, or counterclaim of Fastop, the full amount of all obligations or indebtedness due CHS from Fastop, together with all expenses of collection and reasonable counsel fees incurred by CHS by reason of a default of Fastop.  See Ex. 1, Cummings Declar. at Ex. L.  The obligations under the Guaranty were primary and unconditional obligation and covered all existing and future indebtedness of Fastop to CHS.  See Ex. 1, Cummings Declar. at Ex. L.

By the end of the First Year (July 15, 2003), Fastop had bought

4,880,487 gallons of fuel from CHS. As a result, Fastop was only entitled to receive $122,012.18 in incentive money from CHS for the First Year (4,880,487 gallons x $0.025 per gallon). Moreover, Fastop owed CHS $31,120.89.

On March 26, 2003, Fastop executed an Installment Promissory Note (hereinafter "the March Note"), promising to pay CHS $1,360,697.83, together with 12% annual interest on the unpaid principal, until the debt was fully paid. The March Note included a payment schedule that set forth the amounts and due dates of periodic payments. The final payment on the March Note was due June 27, 2003.

On June 20, 2003, CHS sent Bickhaus a letter asking him to sign another guaranty. This guaranty asked Bickhaus to personally guarantee Fastop's debt. Bickhaus never signed the guaranty.

By June 27, 2003, the balance due on the March Note was $1,243,553.13. Fastop failed to pay any part of the debt. In September 2003, Fastop filed for Chapter 11 bankruptcy protection in the U.S.

Bankruptcy Court for the Central District of Illinois[2].

On January 21, 2004, CHS filed a Proof of Claim in Fastop's bankruptcy. The Proof of Claim stated that Fastop owed CHS $152,987.82 for the overpayment of First Year Incentive Money. See Ex. 1, Cummings Declar. at ¶ 14; Ex. K (Bankruptcy Proof of Claim Form). CHS sued Bickhaus on November 19, 2003, to recover more than $1.4 million from Bickhaus. CHS now seeks summary judgment.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the

---

[2] The Chapter 11 bankruptcy was converted to a Chapter 7 in September 2004.

5

nonmoving party for a jury to return a verdict for that party." <u>Anderson</u> <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

In determining whether a genuine issue of material fact exists, courts must consider the evidence in the light most favorable to the nonmoving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the opposing party must come forward with specific evidence which demonstrates that there is a genuine issue for trial.  <u>Garcia v. Volva Europa Truck, N.V.</u>, 112 F.3d 291, 294 (7th Cir. 1997).

## ANALYSIS

### I.    *Choice of Law*

As there is more than $75,000 in dispute and the case involves a Minnesota citizen (CHS) and an Illinois citizen (Bickhaus), the Court has diversity jurisdiction.  <u>See</u> 28 U.S.C. 1332(a)(1).  In a diversity case, a court's first task is to decide which state's law governs the dispute.  <u>See</u> <u>Midwest Grain Products of Illinois, Inc. v. Productization, Inc.</u> 228 F.3d 784 (7th Cir. 2000).

The Guaranty contains a choice of law provision stating that all

disputes arising from it would be resolved in accordance with Minnesota law.  <u>See</u> Pl.'s Ex. L at ¶8.  Illinois courts have long allowed parties to "substitute the laws of another place or country and enforced the substituted law where it is not dangerous, inconvenient, immoral, nor contrary to the public policy of Illinois."  <u>See</u> <u>Vencor, Inc. v. Webb</u>, 33 F.3d 840, 844 (7th Cir.1994) (citations and internal quotations omitted).

Bickhaus contends that Illinois public policy would be offended if the Court applied Minnesota law and found him to be personally liable for a corporate debt he guaranteed in his corporate capacity.  Bickhaus cites numerous cases in his attempt to avoid the application of Minnesota law.  However, he fails to cite a single case that says Illinois public policy prohibits corporate officers from being held liable for debts they personally guarantee.  Accordingly, the Court discerns no reason why an Illinois court would find the choice of law provision to be contrary to Illinois public policy.

## II.     *Bickhaus's Liability for the Guaranty*

In <u>Minnesota Power & Light Co.v. Cellu-Tech, Inc., et al.</u>, 1990

WL 43051 (Minn.App. 1990) (unpublished), plaintiff sent the defendant corporation an agreement which stated that "undersigned does hereby agree to accept service and pay therefore . . . ." Id. at *1. Two of the corporation's officers signed the agreement. Under their signatures appeared the words "Personal Guarantee," their names, and their corporate titles. The plaintiff sued the corporate officers and the trial court found that they personally guaranteed the debt. The corporate officers appealed, arguing the agreement was a corporate debt and that the inclusion of their corporate titles created an ambiguity as to their liability. Id.

The Minnesota Court of Appeals affirmed the trial court. In doing so, the court held that no purpose would be served by a corporation guaranteeing its own debts. Id., citing Johnson Brothers Wholesale Liquor Co. v. Otto's Liquor, Inc., 194 N.W.2d 592, 592 (1972) (same). The court also held that "the mere fact the [officers] signed the agreement in a representative capacity does not create an ambiguity." Id., citing Ricker v. B-W Acceptance Corp., 349 F.2d 892, 895 (10th Cir.1965) ("Since the language of the instrument manifests a clear intent

8

to bind Ricker, personally, the addition of 'Pres.' following his signature is only *descriptio personae* and does not render the instrument ambiguous.").

In the instant case, Bickhaus signed the Guaranty "Chris Bickhaus, as President of Fastop." Like the corporate officers in <u>Minnesota Power</u>, Bickhaus tries to argue that the inclusion of his corporate title makes Fastop rather than himself liable for any debt. He likewise claims that because he signed the Guaranty and included his corporate title, it is ambiguous whether he or Fastop is responsible for the debt.

Minnesota's law on these issues is limited, but clear. Because no purpose would be served by a corporation guaranteeing its own debts, the inclusion of Bickhaus's corporate title is of no moment. <u>Minnesota Power</u>, 1991 WL 43051 at *1; <u>Johnson Brothers</u>, 194 N.W.2d at 592.

Furthermore, the Guaranty clearly distinguishes between Fastop and Bickhaus. Fastop is referred to as "the Customer" and Bickhaus is "the undersigned." <u>See</u> Pl.'s Ex. L. The Guaranty's language expressly states that "[t]he obligation of the undersigned is a primary and unconditional obligation, and covers all existing and future indebtedness

of the Customer to CHS." <u>Id.</u> at ¶4.  Thus, Bickhaus assumed personal liability for Fastop's debt when he signed the Guaranty.  <u>See</u> <u>Charmoll Fashions, Inc. v. Otto</u>, 348 N.W.2d 717, 719 (Minn. 1976) (the party who signs a guaranty is liable for its underlying obligations).

Moreover, Bickhaus wrongly asks the Court to consider evidence of his intent when signing the Guaranty.  Bickhaus insists that conversations with CHS's agents, Stuart Wilson and Scott Beiswenger, show that he was not personally guaranteeing any of Fastop's debts. Bickhaus claims that he told Wilson and Beisewenger that he would not sign a personal Guaranty.  He argues that CHS knew this or it would not have sent him a request for a personal guarantee on June 20, 2003.

Parol evidence, such as the evidence Bickhaus relies on, is ordinarily inadmissible to vary, contradict, or alter a written agreement.  <u>See Hruska v. Chandler Assocs., Inc.</u>, 372 N.W.2d 709, 713 (Minn.1985).  A court may only admit parol evidence to determine parties' intent when a contract is ambiguous and there is a need to clarify the ambiguity.  <u>See Nord v. Herreid</u>, 305 N.W.2d 337, 340 (Minn.1981); <u>ICC Leasing Corp. v. Midwestern Mach. Co.</u>, 257 N.W.2d 551, 554 (Minn.1977).  When

10

Bickhaus signed the Guaranty, the addition of his corporate title did not create any ambiguity since his corporate title was legally meaningless. His signature on the Guaranty, therefore, indicates a clear intent to personally guarantee Fastop's debts. Accordingly, the Guaranty is unambiguous and evidence of Bickhaus's intent is inadmissible.

### III.    Bickhaus's Debt to CHS

In the balance of its summary judgment motion, CHS asks the Court to find Bickhaus liable for the June Note, the March Note, and the Participation Agreement. CHS asserts that Bickhaus owes it $31,120.89, plus interest, under the June Note; $1,243,553.13, plus interest, under the March Note; and $152,987.82 under the Participation Agreement.

Contrary to the requirements of Local Rule 7.1(D)(2)(c), Bickhaus's Response does not make any argument in opposition to CHS's assertions. Bickhaus has, therefore, waived argument concerning the amount of his debt. Even if Bickhaus had argued this issue, it would have accomplished little. The undisputed evidence[3] shows that Bickhaus

---

[3] In his Response, Bickhaus claims that CHS failed to prove that it applied all "just credits" to which he was entitled. However, the declaration of Rick Cummings, CHS's Director of Marketing and Retail Development, clearly states that CHS provided all just credits. Cummings' affidavit is competent evidence. Bickhaus could have rebutted this evidence by filing an affidavit contesting Cummings' claim or providing records that contradicted

11

owes CHS the sums it seeks.  <u>See</u> Pl.'s Ex. 1 (Cummings' Decl. at ¶¶ 7-8,

10-14, and 17-19); Ex. C, G, and K (Bankruptcy Proof of Claim Forms);

Ex. H (Participation Agreement).

   <u>Ergo</u>, Plaintiff CHS, Inc.'s Motion for Summary Judgment (d/e 23)

is ALLOWED.  Judgment is entered in favor of CHS Inc. and against

Christopher Bickhaus.

   All pending motions are DENIED AS MOOT.  The Final Pretrial

Conference and Trial are CANCELED.

   IT IS SO ORDERED.

   ENTER: January 25, 2005

   FOR THE COURT:

                    s/ Richard Mills
                    United States District Judge

---

Cummings' statements.  Bickhaus failed to do this.